T.C. Memo. 2002-104


UNITED STATES TAX COURT


SAM AND ANNA ZHADANOV, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14021-95, 24646-95,    Filed April 25, 2002.
          24647-95.


Sam and Anna Zhadanov, pro sese.

<u>Shawna Early</u>, <u>Alan S. Kline</u>, <u>Theodore R. Leighton</u>,

<u>Timothy V. Mulvey</u>, and <u>Michelle Or</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>: In separate notices of deficiency, respondent

determined the following income tax deficiencies, penalties, and

---

[1]The following cases are consolidated herewith:  Vortex
Products Corp., docket No. 24646-95; and Sam Zhadanov, docket No.
24647-95.

additions to tax with respect to petitioners' Federal income
taxes:

Vortex Products Corp. (Vortex), docket No. 24646-95

| FYE Sept. 30 | Deficiency | Addition to Tax Sec. 6651(f)[2] | Penalty Sec. 6663 |
|---|---|---|---|
| 1991 | $ 28,813 | | $21,610 |
| 1992 | 85,831 | | 64,373 |
| 1993 | 77,968 | $58,476 | |

Sam and Anna Zhadanov (the Zhadanovs), docket No. 14021-95

| Year | Deficiency | Penalty Sec. 6663 |
|---|---|---|
| 1990 | $35,031 | $26,273 |
| 1991 | 61,862 | 46,397 |
| 1992 | 77,522 | 58,142 |

Anna Zhadanov

| Year | Deficiency | Penalty Sec. 6663 |
|---|---|---|
| 1993 | $60,272 | $45,204 |

Sam Zhadanov, docket No. 24647-95

| Year | Deficiency | Penalty Sec. 6663 |
|---|---|---|
| 1993 | $43,048 | $32,286 |

Alternatively, respondent also determined that Vortex was liable
for the addition to tax under section 6651(a) if we conclude that
Vortex is not liable for the penalty under section 6651(f) for
its FYE 1993 and that the Zhadanovs were liable for accuracy-
related penalties under section 6662(a) if we conclude that they

---

[2]Unless otherwise indicated, all section references are to
the Internal Revenue Code for the years in issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

are not liable for the section 6663 penalties determined in the notices of deficiency.

In an Amendment to Answer filed October 5, 1999, respondent asserted an increased deficiency of $127,070 and an increased section 6663 penalty of $95,302 against Vortex for FYE 1993.

These cases were consolidated for trial, briefing, and opinion pursuant to Rule 141(a) because they present common issues of fact and law. Hereinafter, we refer to the consolidated cases as this case.

After the parties' concessions,[3] the remaining issues for decision are:

(1) Whether Vortex is liable for the fraud penalty under section 6663, or alternatively, for the accuracy-related penalty under section 6662(a) for FYEs 1991 and 1992;

(2) whether Vortex is liable for the addition to tax for fraudulent failure to file a tax return under section 6651(f), or

---

[3]Petitioner Vortex Products Corp. (Vortex) conceded its deficiencies at trial. Mr. Zhadanov admitted that he did not pay tax on his Social Security benefits for 1993. On its FYE 1993 tax return and petition, Vortex claimed that it was entitled to a deduction for property forfeited by Mr. Zhadanov pursuant to his plea agreement in United States v. Zhadanov, No. 93-240, 1995 U.S. Dist. Lexis 5707 (E.D. Pa. Apr. 25, 1995). Petitioners did not present any evidence or make any further argument regarding this claim. Accordingly, we treat this claim as abandoned and do not address it herein. See Bradley v. Commissioner, 100 T.C. 367, 370 (1993); Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

alternatively, for the delinquency addition to tax under section 6651(a) for FYE 1993;

(3) whether respondent is barred by section 6501(a) from assessing a deficiency against Vortex for FYE 1991;

(4) whether the Zhadanovs received constructive dividends from Vortex in 1990, 1991, 1992, and 1993 in the amounts determined by respondent or in any amounts;

(5) whether Mr. Zhadanov was required to include a portion of his 1993 Social Security benefits in his income for 1993;

(6) whether the Zhadanovs are liable for the fraud penalty under section 6663, or alternatively, for the accuracy-related penalty under section 6662(a), for any of the years at issue;

(7) whether respondent is barred by section 6501(a) from assessing a deficiency against the Zhadanovs for 1990 and 1991;[4]

(8) whether the additions to tax for fraud proposed against Mr. Zhadanov violate the Double Jeopardy Clause of the United States Constitution; and

(9) whether Mrs. Zhadanov is entitled to relief from joint and several liability under section 6015 for 1990, 1991, and 1992.[5]

---

[4]The Zhadanovs claimed that Form 872, Consent to Extend Time to Assess Tax, extending the period of limitations to Dec. 31, 1995, for taxable year 1991, is invalid as it was obtained under duress.

[5]Petitioners also argue that Mrs. Zhadanov is entitled to
(continued...)

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated in this opinion by this reference.

A.   Background

The Zhadanovs were married in 1957 and remained married throughout the years at issue.  The Zhadanovs were born in Kiev, Ukraine, and immigrated to the United States in 1973.  Before they emigrated, both Mr. and Mrs. Zhadanov earned a degree in mechanical engineering in the former Soviet Union.  The Zhadanovs' legal residence was in Brooklyn, New York, when they filed their petitions in this case.

Mr. Zhadanov was president and sole shareholder of Vortex Products Corp. (Vortex) during the years at issue.  Vortex had its principal place of business in Brooklyn, New York, when it filed its petition in this case.

In 1981, Vortex was incorporated in New Jersey to engineer, develop, and manufacture plastic products.  Since its incorporation, Vortex has derived its income from the manufacture and sale of various brush products, safety syringe holders, and custom-molded products for which Mr. Zhadanov held patents.  For

---

[5](...continued)
relief from joint and several liability for any income tax deficiency for 1993 under sec. 6015.  However, Mrs. Zhadanov filed a separate Federal income tax return for 1993, and, therefore, sec. 6015 does not apply to 1993.

all relevant years, Vortex used the cash method of accounting and a FYE September 30.

Mrs. Zhadanov worked as a senior engineer for a Russian consulting firm before moving to the United States. After the Zhadanovs immigrated, Mrs. Zhadanov first worked as a draftsman and then she became a design engineer in 1974. In 1985, Mrs. Zhadanov began working for Vortex as its bookkeeper. She also calculated Vortex manufacturing costs for various products, including plastic vials. Throughout the years at issue, Mrs. Zhadanov was listed on corporate documents as a Vortex corporate officer.

Mrs. Zhadanov prepared all financial documents for Vortex, sometimes with the assistance of Anthony Abbate, C.P.A. She also supplied Mr. Abbate with all documents used to prepare Vortex's tax returns. Mrs. Zhadanov regularly reviewed the documents prepared by Mr. Abbate and periodically called him with questions.

In 1986, the Zhadanovs and their son Eli Zhadanov formed a partnership "100 Prospect Associates" through which they purchased property located at 108 Prospect Street (the Prospect Street property). Vortex moved its operations to the Prospect Street property that same year. Vortex paid monthly rent of $8,000 directly to Mr. Zhadanov, who deposited the checks into the Zhadanovs' personal checking account. In turn, the Zhadanovs

paid the Prospect Street property mortgage and taxes from their personal checking account. The Zhadanovs also paid numerous Vortex expenses for facility upgrades out of their personal checking account during the years at issue.

In 1990, the Zhadanovs sold their house in Metuchan, New Jersey, and used the net proceeds of $180,000 to pay off the balance of the mortgage on the Prospect Street property.

B.    Plastic Vial Manufacturing

In 1990, Mr. Zhadanov was approached by Henry Belkin and Leonard Edelson to create custom molds to manufacture plastic vials. Belkin and Edelson were in the business of purchasing and selling vials for crack cocaine, but they represented to Mr. Zhadanov that the plastic vials were for perfume oil samples.

Belkin and Edelson used Tri-State General, a front company, to conduct business with Vortex. Vortex and Tri-State General signed an agreement to begin production of the plastic vials in November 1990. Belkin and Edelson wanted to pay cash for the plastic vials and molds and told Mr. Zhadanov that they did not want Vortex to deposit the cash in the bank. Although Mr. Zhadanov initially insisted that Vortex be paid by check, when production began, Belkin and Edelson paid Vortex using a combination of checks and cash.

Vortex conducted business directly with Tri-State until May 1991 when Mr. Zhadanov learned that the Government had seized a

shipment of vials, allegedly because the vials were being used by drug dealers to hold crack cocaine. Vortex ceased production of the plastic vials for a few weeks thereafter but then resumed vial production in July 1991. From that date, Belkin and Edelson paid Vortex for the plastic vials solely in cash.

In an attempt to insulate Vortex from Belkin and Edelson's drug activities, Sam Zhadanov entered into a leasing agreement with Alex Srebrianski, a Vortex employee, in July 1991. The agreement provided that Mr. Srebrianski's company, U.S. Trading, would lease Vortex's machinery and premises for $8,000 per month for the purpose of manufacturing plastic vials. In reality, Vortex continued its production of the plastic vials. Mr. Zhadanov remained in control of the manufacturing operations at Vortex and deducted the expenses associated with the manufacture of the plastic vials on Vortex's tax returns for the years at issue.

Alex Srebrianski delivered the vials, collected the cash payments from Belkin and Edelson, and turned the cash over to Mr. Zhadanov at the Vortex factory. At the Zhadanovs' direction, Alex deposited a portion of the cash receipts into U.S. Trading's checking account. He then wrote checks to Vortex from U.S. Trading's checking account and included the notation "lease" on each check.

C.    Cash Hoard

Checks that Vortex received from Tri-State General and U.S. Trading were deposited into the corporate checking account and recorded in the Vortex general ledger.  However, cash received from Belkin and Edelson and Srebrianski was not deposited into the corporate checking account or recorded in the Vortex general ledger.  Instead, Mrs. Zhadanov recorded the cash in a cash receipts journal and later into a cash disbursement journal.  The cash receipts journal recorded cash received by Vortex in connection with the plastic vial production totaling $728,346.  The cash disbursement journal recorded expenses and income generated by the plastic vial production.  With two exceptions, the entries in the cash receipts journal and the summary of cash income in the cash disbursement journal correspond exactly.

Mrs. Zhadanov put the cash from the sale of plastic vials in shoe boxes she kept in a safe located at the Zhadanovs' residence.  Each shoe box had a tally slip on which Mrs. Zhadanov kept a running total of the balance to indicate whether money was added or removed from the shoe box.  Sometimes, cash from one shoe box was combined with another shoe box in an effort to save space in the safe.

Vortex did not report the cash receipts on its income tax returns, financial statements, general ledger, or a 1992 application for a $400,000 loan to buy equipment.

On occasion, Mr. Zhadanov used cash to pay Vortex expenses, including raw materials and employee salaries.

D.   Swiss Bank Account and Trips to Europe

The Zhadanovs made several trips to Russia and Europe during the years at issue.

In April 1992, the Zhadanovs traveled to Switzerland and opened an account in the names of Sam, Anna, and Eli Zhadanov at the Union Bank of Switzerland (UBS) in Zurich.[6]

In July 1992, the Zhadanovs traveled to Switzerland.  From Switzerland, they traveled to Kiev to investigate potential materials to use in manufacturing a new medical x-ray screening device.

On the July 1992 trip to Switzerland the Zhadanovs deposited several marked U.S. Postal Money Orders (the money orders) totaling $12,000 into the UBS account and withdrew a corresponding amount of cash, which they used, at least in part, to pay travel and related expenses.[7]  The money orders originated

---

[6]Over the course of the next year, the Zhadanovs deposited $300,000 into the Union Bank of Switzerland (UBS) account.  The Zhadanovs did not disclose the UBS account on their 1992 or 1993 income tax returns.  The Zhadanovs claimed that the funds in the UBS account were given to them by Russian businessmen interested in bringing money into Europe to invest.  Mr. Zhadanov did not know the names of the Russian businessmen but claimed that his son Eli had developed the contacts through his video rental business at the U.S. embassy in Moscow.

[7]Mr. Zhadanov testified that the unspent portion of the $12,000 was brought back to the United States.  Mr. Zhadanov also
(continued...)

from a Government informer who used them to pay Belkin for an order of plastic vials. Belkin, in turn, used them to pay Vortex. After tracing the deposit, the U.S. Postal Service turned over the negotiated money orders to an agent of the Criminal Investigation Division, Internal Revenue Service.

In September 1992, the Zhadanovs made another trip to Switzerland, in part to explore the potential for expanding Vortex's manufacturing business to Europe. Prior to departing on this trip, Mr. Zhadanov had exchanged correspondence with Jack Reiss, a commercial broker, regarding suitable commercial space for a new manufacturing facility. During the trip, Mr. Reiss showed Mr. Zhadanov potential warehouse space for product assembly, and following the meeting, Mr. Reiss sent Mr. Zhadanov a letter detailing the procedures for marketing, distribution, and sales in Europe. The Zhadanovs also traveled from Switzerland to Milan and Bergamo in Italy during September 1992 to meet with potential Vortex clients.

E.   Criminal Investigation of Vortex and Sam Zhadanov

In May 1993, after an investigation by various Federal and State law enforcement agencies, Mr. Zhadanov was arrested on charges stemming from his relationship with Belkin and Edelson and his manufacture and sale of alleged crack vial paraphernalia,

---

[7](...continued)
testified that whenever he used money from the safe for business expenses, he returned unspent portions to the safe.

(i.e., plastic vials).  Incident to the arrest, law enforcement agents searched the Vortex facility and the Zhadanovs' apartment where they seized $827,981 in cash from the safe.

Mr. Zhadanov pleaded guilty in March 1994 to charges of conspiracy to aid and abet the distribution of crack cocaine and money laundering.  Pursuant to his plea agreement, Mr. Zhadanov agreed to forfeit the $827,981 in cash seized from the safe, his properties, Vortex's assets, funds in his personal bank accounts, and Vortex funds traceable to the UBS account in Switzerland.  Mr. Zhadanov also agreed to cooperate with the Internal Revenue Service by filing accurate personal and corporate Federal income tax returns for relevant years.  In return, Mr. Zhadanov received a reduced sentence of 5 years in prison at his sentencing hearing in August 1994.[8]

F.   Notices of Deficiency and Reconstruction of Income

Vortex filed timely corporate tax returns for FYEs 1991 and 1992.  Vortex received an extension to file its FYE 1993 return

---

[8]In the criminal proceedings against Mr. Zhadanov in the United States District Court for the Eastern District of Pennsylvania, Mrs. Zhadanov, Eli Zhadanov, and Mr. Zhadanov's mother, Maria Zhadanov, filed a claim to recover a portion of the seized funds in which they alleged they owned in the aggregate, $200,000 of the $827,981 seized from the Zhadanovs' safe and subject to forfeiture.  During the forfeiture hearing, Mrs. Zhadanov introduced into evidence the Vortex cash receipts journal in an attempt to explain the source of cash in the safe. The journal had not been seized with the Vortex corporate records during the May 1993 search of the Vortex factory and the Zhadanovs' residence.  The District Court denied the claims of Mrs. Zhadanov, Eli, and Maria Zhadanov.

until June 15, 1994, but did not file its FYE 1993 return until October 1995.

On August 23, 1995, respondent issued a notice of deficiency to Vortex for its FYEs 1991, 1992, and 1993. Although respondent's agents performed net worth analyses and source and application of funds analyses on Vortex and the Zhadanovs in an effort to reconstruct their income for the years at issue, those analyses proved inconclusive. Consequently, respondent determined in the notice of deficiency issued to Vortex that Vortex had unreported vial income for those years equal to the cash receipts shown in Vortex's cash receipts journal ($728,346) and that Vortex was liable for fraud penalties under section 6663 for FYEs 1991 and 1992 and for the addition to tax for fraudulently failing to file its return for FYE 1993.[9] The Zhadanovs filed timely joint Federal income tax returns for 1990, 1991, and 1992, and filed timely married filing separate returns for 1993. The Zhadanovs subsequently signed Form 872, Consent To Extend The Statute Of Limitations On Assessment And Collection Of Their Individual Tax, extending the period of limitations for 1991 to December 31, 1995.

---

[9]Respondent does not dispute that the cash receipts journal accurately reflects the cash income Vortex received from the plastic vial sales. The Zhadanovs admit that the cash received from the plastic vial sales was deposited in the safe and not included as income on Vortex's tax returns.

In notices of deficiency dated May 23, 1995, respondent determined that Vortex's unreported income[10] for the FYEs 1990 through 1993 was taxable to the Zhadanovs personally as constructive dividends. Respondent also determined that Mr. Zhadanov must include a portion of his Social Security benefit for 1993 in income and that the Zhadanovs were liable for the fraud penalty under section 6663 or, alternatively, for the accuracy-related penalty under section 6662 for each of the taxable years at issue.

OPINION

I.   The Statute of Limitations Issues

Petitioners contend that the period of limitations on assessment has expired with respect to the Zhadanovs for 1990 and 1991 and with respect to Vortex for FYE 1991. The Zhadanovs timely filed their 1990 tax return on April 15, 1991, and filed their 1991 tax return on April 15, 1992. Respondent mailed the notice of deficiency for those years on May 23, 1995. Vortex timely filed its tax return for FYE 1991 on December 16, 1991, and the notice of deficiency for that year was issued on May 23, 1995.

Generally, the Commissioner must assess an income tax deficiency for a specified year within 3 years from the date the

---

[10]Respondent determined the Zhadanovs received $117,829 for 1990; $203,813 for 1991; $249,318 for 1992; and $157,386 for 1993 from Vortex (totaling $728,346 for the years at issue).

taxpayer's return for that year was filed.  Sec. 6501(a).
However, in cases where a party files a false or fraudulent
return with the intent to evade tax, the tax may be assessed at
any time.  Sec. 6501(c)(1).  Respondent argues that Vortex and
the Zhadanovs fraudulently understated their income for all the
years at issue and that, therefore, the exception under section
6501(c)(1) to the general 3-year limitations rule of section
6501(a) applies.[11]

Respondent bears the burden of proving that an exception to
the general 3-year limitation period set forth in section 6501(a)
applies.  Rule 142(b); Harlan v. Commissioner, 116 T.C. 31, 39
(2001).  In order to rely upon the fraud exception under section
6501(c)(1), respondent must prove the same elements as he must
prove to impose an addition to tax for fraud under prior section
6653(b).  Mobley v. Commissioner, T.C. Memo. 1993-60, affd.
without published opinion 33 F.3d 1382 (11th Cir. 1994).  The
elements that must be proved to support the imposition of the
fraud addition to tax under prior section 6653(b) are essentially
the same elements that must be proved to impose the fraud penalty

---

[11]Respondent also argues that the 6-year period of
limitations provided in sec. 6501(e) applies to petitioners if we
conclude that sec. 6501(c)(1) is not applicable.  Sec. 6501(e)
provides that tax may be assessed at any time within 6 years
after a return is filed that omits from gross income an amount
exceeding 25 percent of the amount of gross income stated in the
return.

under section 6663(b).[12]  See, e.g., <u>Rhone-Poulenc Surfactants &</u>
<u>Specialties, L.P. v. Commissioner</u>, 114 T.C. 533, 548 (2000),
appeal dismissed and remanded 249 F.3d 175 (3d Cir. 2001).
Because our resolution of the limitations issues depends, at
least initially, upon our resolution of the fraud issues in this
case, we examine first whether, on this record, respondent has
proven that Vortex and/or the Zhadanovs engaged in fraudulent
conduct under section 6663(b).

II.  <u>Fraud Penalty In General</u>

In order for the Commissioner to prove that a taxpayer is
liable for a fraud penalty under section 6663(b) or its
predecessor, the Commissioner must prove by clear and convincing
evidence that (1) an underpayment of tax exists, and (2) some
part of the underpayment is due to fraud.  Sec. 7454(a); Rule
142(b); <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 873 (1991), affd. 959
F.2d 16 (2d Cir. 1992).  The Commissioner may not rely on a
taxpayer's failure to carry its burden of proof on the underlying
deficiency as proof that the taxpayer underpaid his tax.  <u>DiLeo</u>
<u>v. Commissioner</u>, <u>supra</u>.

Fraud is established by showing that the taxpayer intended
"to evade tax believed to be owing by conduct intended to

---

[12]Sec. 6663(a) was added to the Code by sec. 7721(a) of the
Omnibus Budget Reconciliation Act of 1989 (OBRA 1989), Pub. L.
101-239, 103 Stat. 2395-2398.  Prior to the passage of OBRA 1989,
the fraud penalty (or addition to tax, as it was then known) was
contained in former sec. 6653(b).

conceal, mislead, or otherwise prevent the collection of such tax." Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). Fraud "does not include negligence, carelessness, misunderstanding or unintentional understatement of income." United States v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956). Although respondent bears the burden of proving by clear and convincing evidence that a taxpayer has filed a fraudulent return with the intent to evade tax, respondent need not prove the precise amount of the underpayment resulting from fraud; he must only prove that some portion of the underpayment of tax for each year is due to fraud. Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. DiLeo v. Commissioner, supra at 874. Fraud is never presumed and must be established by independent evidence of fraudulent intent. Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), affg. T.C. Memo. 1986-223. Fraud may be shown by circumstantial evidence because direct evidence of the taxpayer's fraudulent intent is seldom available. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). However, fraud is not proven when a court is left with only a suspicion of fraud, and even a strong suspicion

is not sufficient to establish a taxpayer's liability for the fraud penalty. Olinger v. Commissioner, 234 F.2d 823 (5th Cir. 1956), affg. in part and revg. in part on another ground T.C. Memo. 1955-9; Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950); Green v. Commissioner, 66 T.C. 538, 550 (1976); Axelrod v. Commissioner, T.C. Memo. 1982-92, affd. 711 F.2d 1062 (9th Cir. 1983).

Courts have relied upon a number of indicia or badges of fraud in deciding whether an underpayment of tax is due to fraud. E.g., Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Clayton v. Commissioner, 102 T.C. 632, 647 (1994); Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). Although no single badge is necessarily sufficient to establish fraud, the existence of several badges of fraud constitutes persuasive circumstantial evidence of fraud. Petzoldt v. Commissioner, supra.

Respondent contends that the following badges of fraud are present in this case: (1) Understatement of income; (2) failure to file tax returns; (3) implausible or inconsistent explanations of behavior; (4) concealment of assets; (5) failure to cooperate with tax authorities; (6) engaging in illegal activity; (7) attempting to conceal illegal activity; and (8) extensive

dealings in cash.  We consider these badges as appropriate in deciding whether Vortex and the Zhadanovs are liable for the fraud penalty for any of the years at issue.

III.  Vortex Issues

A.  The Fraud Penalty Against Vortex for FYEs 1991 and 1992

1.  The Underpayment Requirement

Respondent asserts Vortex fraudulently underreported its income for FYEs 1991 and 1992, and fraudulently failed to file a tax return for FYE 1993.  Vortex concedes that it did not include cash receipts from vial sales in gross income for FYEs 1991, 1992, and 1993, but disputes that its omission of income for FYEs 1991 and 1992, and its failure to timely file its Federal income tax return for FYE 1993 were fraudulent.

2.  The Underpayment Due to Fraud Requirement

Respondent determined petitioners were liable for additions to tax and penalties for FYEs 1991 and 1992 under section 6663, which provides: "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud."

In deciding whether a corporation has acted fraudulently, we examine the actions of the corporation's officers.  DiLeo v. Commissioner, supra at 874; Kahrahb Rest., Inc. v. Commissioner, T.C. Memo. 1992-263 ("A corporation can act only through

individuals who are its officers or employees"). The fraud of a sole or dominant shareholder may be attributed to the corporation. E.J. Benes & Co. v. Commissioner, 42 T.C. 358, 383 (1964), affd. 355 F.2d 929 (6th Cir. 1966). In this case, we must consider the actions of Mr. Zhadanov, Vortex's president and sole shareholder, in deciding whether some portion of Vortex's underpayments of tax for FYEs 1991 and 1992 was due to fraud.

The record in this case is replete with evidence supporting respondent's determination that Vortex's underpayments of tax were due to fraud. Among the evidence of fraud in the record are the following:

(1) Repeated Understatements of Income. Vortex conceded it failed to report income received from the manufacture and sale of plastic vials for FYEs 1991 and 1992. That failure resulted in underpayments of tax in excess of $28,000 and $85,000, respectively. This failure to report substantial amounts of income over successive years is persuasive evidence of fraudulent intent. Kurnick v. Commissioner, 232 F.2d 678 (6th Cir. 1956), affg. T.C. Memo. 1955-31.

(2) Implausible or Inconsistent Explanations of Behavior. Vortex, through Mr. Zhadanov, gave inconsistent and implausible explanations for not depositing the unreported income from vial sales in the bank. First, Mr. Zhadanov claimed that he did not deposit cash into the Vortex checking account because he did not

know how to make such deposits.  We find this explanation implausible given Mr. Zhadanov's level of education and entrepreneurial efforts at Vortex.  In addition to his position as president of Vortex, Sam Zhadanov held numerous U.S. patents and a degree in mechanical engineering.  We do not find his testimony regarding his inability to perform such ministerial tasks as depositing cash in a bank account to be credible.

Second, Mr. Zhadanov testified that he did not deposit cash into the Vortex checking account because Belkin and Edelson did not want to be revealed as the source of such cash.  Mr. Zhadanov testified that he did not question the request because he believed Belkin and Edelson had a legitimate business, as they sold the plastic vials openly in their stores.  Whatever Mr. Zhadanov's belief might have been when Vortex first agreed to manufacture plastic vials for Belkin and Edelson, the evidence reflects that, no later than July 1991, Mr. Zhadanov became aware of the intended use of the plastic vials, but he did not terminate his business dealings with Belkin and Edelson.  Instead, Mr. Zhadanov attempted to hide Vortex's involvement in the manufacturing process by arranging for a front company to "rent" Vortex's operation.

(3) Concealment of Assets.  Vortex concedes that it did not deposit the cash income derived from the manufacture and sale of the plastic vials in its corporate bank account or report the

income for Federal income tax purposes. Although Mr. Zhadanov testified that, as a Russian, he did not trust banks and was unaccustomed to keeping his money in banks, we are convinced that Mr. Zhadanov intended to conceal the cash by keeping it in his safe. Mr. Zhadanov's intent to conceal the cash is further demonstrated by his concealment of the cash from his accountant. See Duffey v. Commissioner, 91 T.C. 81 (1988); Langworthy v. Commissioner, T.C. Memo. 1998-218 (taxpayer's failure to be forthcoming with his return preparer was evidence of fraud).

(4) Engaging in Illegal Activity. Vortex was engaged in the illegal manufacture and sale of plastic vials used in the distribution of crack cocaine during the years at issue. As we have previously stated, it is reasonable for us to assume that, when income is derived from illegal activity, a taxpayer's failure to report the income is intended to mislead and frustrate a potential criminal prosecution and is an indication of a taxpayer's intent to evade his taxes. Reed v. Commissioner, T.C. Memo. 1997-388, affd. per curiam without published opinion 155 F.3d 560 (4th Cir. 1998); Baker v. Commissioner, T.C. Memo. 1991-340, affd. without published opinion 9 F.3d 1550 (9th Cir. 1993).

(5) Attempting To Conceal Illegal Activity. When Mr. Zhadanov became aware that the plastic vials were being used in the distribution of crack cocaine, he attempted to distance Vortex from Belkin and Edelson. He entered into a sham lease of

the Vortex factory with Alex Srebrianski and U.S. Trading and used the ostensible leasing transaction to launder a portion of the cash generated by the plastic vial sales. A taxpayer's attempt to conceal its illegal activity, particularly when the attempt contributes to the understatement of a taxpayer's income, is an indication of fraud. Spies v. United States, 317 U.S. 492, 499 (1943).

(6) Extensive Dealings in Cash. Vortex amassed a considerable cash hoard and used some of the cash to pay some of Vortex's expenses, including the cost of raw materials and Alex Srebrianski's salary.

Based on the above, we hold that Vortex's underpayment of tax resulting from its failure to report proceeds from the sale of plastic vials on its Federal income tax returns for FYEs 1991 and 1992 was attributable to fraud and that therefore Vortex is liable for the fraud penalty under section 6663 for each of those years.

B.  The Fraudulent Failure To File Penalty Against Vortex for FYE 1993

Respondent determined that Vortex was liable for the addition to tax pursuant to section 6651(f)[13] for fraudulently

---

[13]Sec. 6651(a) imposes an addition to tax for late filing equal to 5 percent of the amount required to be shown on the return if a taxpayer files within 1 month of the date prescribed. That section further imposes an additional 5-percent addition to tax for each additional month or fraction thereof that the return

(continued...)

failing to file a timely income tax return for FYE 1993.  Vortex filed its Federal income tax return for FYE 1993 in October 1995, after respondent issued to Vortex the notice of deficiency dated August 23, 1995.

We examine the same badges of fraud we used when considering the imposition of the fraud penalty under section 6663(a) to decide whether Vortex is liable for the addition to tax for fraudulently failing to file a timely tax return under section 6651(f).  Clayton v. Commissioner, 102 T.C. 632, 653 (1994).  Our analysis, however, necessarily must focus on the taxpayer's decision not to file its return when due for it is only if that decision was made with the intent to evade tax that the addition to tax under section 6651(f) may properly be imposed.  Respondent bears the burden of proving by clear and convincing evidence that an underpayment exists and that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes by not filing his return when due.  Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

---

[13](...continued)
is not filed, not to exceed 25 percent in the aggregate.  If any failure to file a return is fraudulent, sec. 6651(f) increases the additions to tax imposed under sec. 6651(a) to 15 percent of the net amount of tax due for each month that the return is not filed, up to a maximum of 75 percent.

As discussed, supra, Vortex's corporate tax return for the year at issue was due June 15, 1994.[14] Vortex concedes it did not file a tax return for FYE 1993 until after it received the notice of deficiency in August 1995. Vortex maintains that its failure to file its FYE 1993 return by the extended due date was not due to any attempt on its part to evade its taxes but rather was due to other circumstances stemming from the investigation, arrest, trial, and imprisonment of Mr. Zhadanov. Mr. Zhadanov was arrested in May 1993. Incident to the arrest, law enforcement agents searched the Vortex facility and the Zhadanovs' apartment and seized, among other things, many of Vortex's books and records. In January 1994, Mr. Zhadanov pleaded guilty, and from 1994 to 1999 Mr. Zhadanov was incarcerated.

By June 15, 1994, the deadline for filing Vortex's FYE 1993 return, Mr. Zhadanov had already pleaded guilty pursuant to a plea agreement that required him, among other things, to file accurate Federal income tax returns on behalf of Vortex and for himself. The terms of the plea agreement provided an extremely strong incentive to file accurate tax returns because the failure

---

[14]Corporate fiscal year income tax returns are required to be filed on the fifteenth day of the third month following the close of the corporation's fiscal year. Sec. 6072(b). Vortex's income tax return for FYE 1993 was originally due on Dec. 15, 1993, but the filing deadline was extended to June 15, 1994.

to do so could result in a violation of the plea agreement and a harsher sentence for Mr. Zhadanov.

Our review of the record leaves us unconvinced that Vortex fraudulently failed to file its FYE 1993 return. The record leaves us instead with the impression that Vortex's failure to file its return was due to other circumstances such as the seizure of necessary records, and the arrest and imprisonment of Vortex's sole shareholder/president. Because respondent has the burden of proving that Vortex fraudulently failed to file its return by clear and convincing evidence, the unconvincing nature of the record is fatal to respondent's claim. Accordingly, we do not sustain respondent's determination of the section 6651(f) penalty for FYE 1993.

C. The Delinquency Penalty Against Vortex for FYE 1993

Alternatively, respondent determined that Vortex was liable for the addition to tax pursuant to section 6651(a) should we find that Vortex's failure to file was not due to fraud. Vortex bears the burden of proof on this issue.[15] Rule 142(a); Lee v. Commissioner, 227 F.2d 181, 184 (5th Cir. 1955), affg. a Memorandum Opinion of this Court; BJR Corp. v. Commissioner, 67 T.C. 111, 131 (1976).

---

[15]The burden of proof provisions of sec. 7491 do not apply here because the examination in this case began before July 22, 1998. See Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726.

Section 6651(a) authorizes the Commissioner to impose an addition to tax whenever a taxpayer fails to file a required return when due (determined with regard to any extension of the filing deadline) unless the taxpayer shows that such failure was due to reasonable cause and was not due to willful neglect. In this case, the parties agree that Vortex did not file its income tax return for its FYE 1993 by the extended filing deadline. Consequently, in order to avoid liability for the section 6651(a) addition to tax, Vortex must show that its failure to timely file was due to reasonable cause and not due to willful neglect. AJF Transp. Consultants, Inc., v. Commissioner, T.C. Memo. 1999-16, affd. 85 AFTR 2d 1909, 2000-1 USTC par. 50473 (2d Cir. 2000). The term "reasonable cause" is defined as the exercise of ordinary business care and prudence. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. The term "willful neglect" is defined as a "conscious, intentional failure or reckless indifference." United States v. Boyle, 469 U.S. 241, 246 (1985). At trial, Mrs. Zhadanov recited the difficulties she faced in dealing with the Zhadanovs' and Vortex's legal and tax issues while her husband was in jail. She testified that she hired tax lawyers who did nothing but "calculate numbers, numbers, numbers," then withdrew their representation. She testified about the money problems she and her husband encountered as a result of the forfeiture and the efforts that she and other

members of her family took to recover a portion of the forfeited funds. However, Mrs. Zhadanov did not adequately explain why she was unable to prepare, or arrange for the preparation of, Vortex's return in the time between Mr. Zhadanov's guilty plea and Vortex's filing deadline. In addition, Vortex did not make any additional arguments regarding this issue. We conclude that Vortex has failed to prove that it exercised ordinary business care and prudence or that its failure to file was not due to conscious, intentional, or reckless indifference. Accordingly, we hold Vortex liable for the addition to tax under section 6651(a) with respect to FYE 1993.

D. <u>The Limitations Issue</u>

Because we have found that Vortex fraudulently underreported its income and underpaid its income tax for its FYE 1991, we hold that respondent is not barred by section 6501(a) from assessing a deficiency with respect to Vortex for its FYE 1991.

IV. <u>The Zhadanov Issues</u>

A. <u>Respondent's Adjustments to Income</u>

Respondent has determined that the Zhadanovs had unreported constructive dividend income during each of the years at issue attributable to the unreported cash from vial sales that the Zhadanovs kept in their safe. In addition, respondent has determined that Mr. Zhadanov failed to include in income Social

Security benefits he received during 1993.  The Zhadanovs vigorously disagree that they had constructive dividend income in any of the years at issue.  The Zhadanovs bear the burden of proving, by a preponderance of the evidence, that they did not receive the income alleged by respondent.  Rule 142(a).

### 1.  Constructive Dividends

Respondent asserts that the Zhadanovs diverted Vortex income totaling $728,346 and retained it for their personal use.  The Zhadanovs claim that the cash was not diverted but remained Vortex's asset despite its physical location in the Zhadanovs' safe, and that, therefore, they did not underreport their income or underpay their income tax liabilities for the years at issue.

A constructive dividend arises when a corporation confers an economic benefit upon a shareholder without expectation of repayment and the corporation on the date of the deemed distribution had current or accumulated earnings and profits.[16] Crosby v. United States, 496 F.2d 1384, 1388 (5th Cir. 1974); Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987). Constructive dividends are includable in a taxpayer's gross income under section 61(a)(7).

As a general rule, "a taxpayer need not treat as income moneys which he did not receive under a claim of right, which

---

[16]Petitioners conceded that Vortex had sufficient earnings and profits for the years at issue to support a constructive dividend of the amounts at issue.

were not his to keep, and which he was required to transmit to someone else as a mere conduit." Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974). The receipt of money by a taxpayer acting in an agency or fiduciary capacity ordinarily is not a taxable event to that taxpayer. Heminway v. Commissioner, 44 T.C. 96, 101 (1965). The mere fact that funds pass through an owner-taxpayer's hands is not determinative of a constructive dividend. Ashby v. Commissioner, 50 T.C. 409 (1968); Marks v. Commissioner, T.C. Memo. 1963-304.

A greater potential for constructive dividends, however, exists in closely held corporations where dealings between stockholders and the corporation are commonly characterized by informality. Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.05, at 8-39 (7th ed. 2000). "Where a shareholder uses corporate property for his personal benefit, not proximately related to corporate business, the shareholder must include the value of the benefit in income as constructive dividends to the extent of the corporation's earnings and profits." AJF Transp. Consultants, Inc. v. Commissioner, T.C. Memo. 1999-16, affd. 85 AFTR 2d 1909, 2000-1 USTC par. 50473 (2d Cir. 2000); see also DiZenzo v. Commissioner, 348 F.2d 122, 125 (2d Cir. 1965), revg. in part and remanding T.C. Memo. 1964-121; Truesdell v. Commissioner, supra; Falsetti v. Commissioner, 85 T.C. 332, 335-336 (1985); Nicholls, North,

Buse Co. v. Commissioner, 56 T.C. 1225, 1238 (1971); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962). The courts have often used a two-level inquiry to decide whether a taxpayer received constructive dividend income. The first level of inquiry requires an examination of whether the corporation conferred an economic benefit on the shareholder without expectation of repayment. United States v. Smith, 418 F.2d 589 (5th Cir. 1969). The second level requires an examination of whether the benefit primarily advanced the shareholder's personal interest as opposed to the business of the corporation. Ireland v. United States, 621 F.2d 731 (5th Cir. 1980); Sammons v. Commissioner, 472 F.2d 449 (5th Cir. 1972), affg. on this point T.C. Memo. 1971-145; United States v. Gotcher, 401 F.2d 118 (5th Cir. 1968).

Respondent argues that the Zhadanovs received constructive dividends equal to the unreported vial income kept in their safe because their unfettered control over the funds in the safe conferred an economic benefit upon them, and the benefit was primarily personal. Respondent relies upon the fact that Mr. Zhadanov, as president and sole shareholder of Vortex, had ample opportunity to spend the cash by virtue of its location in his personal safe.

Although the Zhadanovs do not dispute that they had physical control over the cash, they vigorously contest that they appropriated the cash to their own use. They emphasize that they never spent any of the unreported corporate cash for personal purposes, as evidenced by the fact that the entire disputed amount was still in the safe on the date the cash was seized and Mr. Zhadanov was arrested in 1993.[17]

Although control over an asset can be evidence of an economic benefit, control of an asset by a shareholder-officer does not necessarily result in a benefit that is taxable to the shareholder. For example, a constructive dividend does not result when, despite "extremely informal" dealings, a sole shareholder's intent in transferring funds from the corporation to his personal checking account "was to use such funds for corporate purposes as an agent of the corporation." Nasser v. United States, 257 F. Supp. 443, 449 (N.D. Cal. 1966); see also Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1215 (5th Cir. 1978). Likewise, we have held that a sole shareholder's physical control over unreported corporate cash does not result in constructive dividends where the shareholder evidences an intention to hold and use those funds for corporate purposes.

_____

[17]We note that $827,981 was seized from the safe in May 1993, but respondent has taken the position in this case that the total unreported vial income for all the years at issue was only $728,346. Implicit in respondent's position is that $99,635 of the cash seized from the safe was not unreported vial income.

Bard v. Commissioner, T.C. Memo. 1990-431; Alisa v. Commissioner,
T.C. Memo. 1976-255.

A careful review of the record in this case reveals a dearth
of credible evidence supporting respondent's position that the
unreported Vortex cash was diverted by the Zhadanovs for their
personal use and economic benefit.  The preponderance of credible
evidence in the record supports the Zhadanovs' position that they
held the unreported cash for corporate use.  At trial, the
Zhadanovs relied upon a cash receipts journal that, for
unexplained reasons, was not seized by the Government when it
executed search warrants in May 1993, and a cash disbursements
journal that recorded Vortex's vial income and related
expenditures, which was seized during the May 1993 search.  Both
documents record Vortex's cash vial income and show it as a
corporate asset.  Respondent apparently concluded that the cash
receipts journal was credible as he relied on it in determining
the amount of Vortex's unreported income from cash vial sales for
each of the years at issue.

The facts clearly establish that the entire amount
respondent determined was unreported constructive dividend income
was seized by Government agents in May 1993.  Respondent's only
credible evidence in support of his determination that the
diverted corporate cash was a constructive dividend to the
Zhadanovs is that the Zhadanovs had physical control over the

cash. We are not convinced that such control, without some evidence that the Zhadanovs intended to appropriate the cash for personal use or actually used it for personal purposes, is enough to counter the evidence in the record supporting the Zhadanovs' argument that they held the cash on behalf of Vortex.

Obviously, the Zhadanovs did not use any of the diverted cash for personal purposes because all of the diverted cash at issue in this case was in the safe when it was seized by the Government agents. The record contains no evidence that the Zhadanovs lived a lavish lifestyle inconsistent with their reported income. In fact, although respondent used indirect methods to reconstruct the Zhadanovs' income before he issued the notices of deficiency in this case, respondent did not rely on those analyses, opting instead to treat the seized cash, to the extent recorded in the cash receipts journal, as the unreported income. Although there is evidence in the record that the Zhadanovs used cash from time to time to pay expenses, the expenses in question appear to have been Vortex's expenses, not personal expenses of the Zhadanovs.

Respondent attempts to bolster his argument by pointing to evidence that the Zhadanovs opened a Swiss bank account into which they deposited $300,000 over the course of a year and that the Zhadanovs cashed $12,000 of money orders given in payment of plastic vials and used a portion of the funds to pay travel

expenses while in Europe.  In our view, this evidence falls short of establishing that the Zhadanovs used the diverted corporate cash for personal purposes for several reasons.  First, although respondent implies and even argues that the $300,000 deposited in the Swiss bank account represented unreported vial income, respondent did not "gross up" the alleged unreported income (as determined in the notice of deficiency) to include the $300,000. If respondent's position that the $300,000 consisted of unreported vial income were correct, respondent certainly would have grossed up his calculation of the diverted income from vial sales to include the $300,000.  Respondent did not do so. Second, although the record establishes that the Zhadanovs cashed $12,000 of money orders directly traceable to Vortex's plastic vial sales, the Zhadanovs did so on one of their 1992 trips to Europe during which they explored extending Vortex's manufacturing operations and product lines overseas.  The business purpose of the Zhadanovs' trips is established not only by their testimony but by credible third party evidence confirming the business nature of the trips.  The Zhadanovs' use of part or all of the $12,000 during one of the business trips is not convincing evidence of any intent to appropriate Vortex funds for personal purposes.

The Zhadanovs sometimes held business meetings in their home, and they used the safe in their home for corporate

purposes. The Zhadanovs kept corporate records and cash in the safe because they believed the safe was more secure than the storage facilities at Vortex. While it is certainly true that keeping corporate cash in a shareholder's personal safe creates an ambiguous ownership trail, it is not convincing evidence of fraud that Mr. Zhadanov would do so, particularly where he used both the corporate office and his residence for business purposes.

For the reasons discussed, we conclude that the Zhadanovs did not derive an economic benefit from the unreported Vortex cash and that they did not keep the cash in their safe primarily for their personal benefit. We hold, therefore, that the Zhadanovs did not have constructive dividend income during the years at issue as determined by respondent.

2. Social Security Benefits to Sam Zhadanov

Respondent alleges that Mr. Zhadanov received $6,811 in Social Security benefits for 1993, which he did not include in his gross income as required by section 86. Section 86(a)(1) provides that, except as provided in section 86(a)(2), a taxpayer's gross income includes the lesser of one half of any Social Security benefits received by the taxpayer during the taxable year or one-half of the amount determined under section 86(b)(1).

Mr. Zhadanov's 1993 return actually showed the Social Security benefits he received during 1993 (line 21(a)), but the return does not contain a completed entry on the relevant income line (line 21(b)). Mr. Zhadanov admitted at trial that he received the Social Security benefits in question and that he did not pay tax on those benefits for 1993, but he did not present any additional evidence or make any further argument regarding respondent's adjustment. We conclude, therefore, that Mr. Zhadanov has conceded this issue (assuming that the issue is not computational in nature), Bradley v. Commissioner, 100 T.C. 367, 370 (1993); Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988), and sustain respondent's adjustment accordingly.[18]

B. Fraud Penalty Determined Against the Zhadanovs

Respondent determined that the Zhadanovs were jointly liable for a fraud penalty under section 6663 for 1990, 1991 and 1992, and that Mr. Zhadanov and Mrs. Zhadanov were each liable for a fraud penalty for 1993. Respondent bears the burden of proving by clear and convincing evidence that an underpayment exists and that the underpayment is attributable to fraud. Sec. 7454(a); Rule 142(b).

---

[18]We note, however, that Mr. Zhadanov's 1993 return showed a negative adjusted gross income figure and no taxable income. Even after Mr. Zhadanov's deemed concession is taken into account, it does not appear that Mr. Zhadanov will have any underpayment of tax for 1993, but we leave that analysis to the Rule 155 calculation.

By reason of our holding with respect to the constructive dividend issue, we conclude that the Zhadanovs did not underpay their tax for 1990, 1991 and 1992, and that neither Mr. Zhadanov nor Mrs. Zhadanov had any constructive dividend income in 1993. Moreover, although Mr. Zhadanov must include half of his 1993 Social Security payments in income for 1993, it does not appear that Mr. Zhadanov will have an underpayment for 1993 even after the adjustment is made. We conclude, therefore, that respondent has failed to prove that the Zhadanovs underpaid their tax liability for any of the years at issue. Consequently, we hold that the Zhadanovs are not liable for the fraud penalty for any of the years at issue.

C. <u>Other Issues</u>

Because of our holding regarding the constructive dividend issue, we do not address, and need not decide, the other issues raised by the parties, including the Zhadanovs' assertion regarding the statute of limitations for 1990 and 1991, Mr. Zhadanov's double jeopardy argument, and Mrs. Zhadanov's claim to relief under section 6015.

To reflect the foregoing,

Decision will be entered for petitioners in docket No. 14021-95.

Decisions will be entered under Rule 155 in docket Nos. 24646-95 and 24647-95.