# United States Tax Court

T.C. Memo. 2022-95

ESTATE OF BRETT L. CLEMONS, SR., DECEASED, BRETT LEE
CLEMONS, JR., PERSONAL REPRESENTATIVE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 25029-16.                          Filed September 14, 2022.

———————

*Eric W. Smith* and *Judith S. Schutzbach-Lambert*, for petitioner.

*Sean P. Deneault*, *Jeremy D. Cameron*, and *Mark J. Tober*, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, *Judge*: Brett Clemons, Sr.,[1] opened his first numbered
Swiss bank account in 2001, and he used that account to hide money
from his then wife and the Internal Revenue Service. In 2003 through
2009, the years at issue, he funneled into numbered foreign accounts
income that he did not report on his Forms 1040, U.S. Individual Income
Tax Return. Neither did he report investment income earned in those
accounts. And on various tax forms that required the disclosure of those
accounts, he expressly denied holding any foreign accounts. Despite Mr.
Clemons's efforts to conceal his numbered accounts, the Commissioner
discovered them and determined deficiencies, accuracy-related

———————

[1] Brett Clemons, Sr., passed away on March 27, 2021, after the trial in this
case. Although Brett Clemons, Jr., is the personal representative of the resulting
estate, he was not involved in the underlying facts or the trial of this case. All
references in this Opinion to Mr. Clemons are references to Brett Clemons, Sr.

[*2] penalties, civil fraud penalties, and additions to tax. Mr. Clemons challenged the Commissioner's income determinations and affirmatively asserted he is entitled to various deductions. The Commissioner established by clear and convincing evidence that Mr. Clemons fraudulently underreported his income. And because he destroyed or caused the destruction of his records, Mr. Clemons failed to establish his affirmative claims.

## FINDINGS OF FACT

Brett Clemons was born in Florida and resided there for most of his life. He graduated from the University of South Florida in 1980 with a bachelor's degree in microbiology. His coursework included computer science and math.

Mr. Clemons took what he learned in his computer science coursework and turned it into a career. In the mid-1980s, after working as a programmer for various companies, he started Softwarewizardry, Inc. (SWI), through which he continued providing programming services. He personally handled SWI's finances and taxes. By 2000, he was working as an independent contractor for Hewlett-Packard U.S. (HP USA).

I.    *Mr. Clemons's UBS Account*

In 2001, Mr. Clemons decided to open a Swiss bank account. At the time, he was married with children and worked for HP USA in Tampa, Florida. He hid his plans about opening a foreign bank account from his wife because he intended to get a divorce, to exclude his wife from the contents of that account, and "to move to Europe without [his] wife."

Mr. Clemons put his plan into action. He found a Swiss financial consultant on the internet and requested his services. He then travelled to Lausanne, Switzerland, where the consultant introduced him to a representative of Union Bank of Switzerland (UBS).

On April 10, 2001, Mr. Clemons opened a UBS investment account. He signed multiple account opening documents. The documents were in English and included an acknowledgement of U.S. tax liability, an investment management authorization, a hold-mail agreement, and a U.S. securities waiver. Mr. Clemons was the account's sole owner and signatory.

[*3]    The UBS account had several features that helped Mr. Clemons shield it from detection. The account was numbered, meaning UBS replaced Mr. Clemons's name as the accountholder with a number. By entering into a U.S. securities waiver, Mr. Clemons expressly waived his right to invest in U.S. securities, thereby avoiding U.S. tax reporting requirements for income attributable to U.S. securities. Through a hold-mail agreement, Mr. Clemons paid UBS a fee to hold his account correspondence and to destroy any unclaimed mail after holding it for three years. As a result, UBS never mailed account statements to Mr. Clemons in the United States.

Mr. Clemons invested through his UBS account. During his first two years as an accountholder, he deposited over $400,000 and authorized UBS to invest those funds. Focusing on an investment horizon in excess of 20 years, he selected a balanced investment strategy that offered long-term "growth of assets, interest and dividend income [and] capital gains." He distributed his funds across multiple categories of investment products, including market funds, bonds, and private equity funds. Many of those products are considered "passive foreign investment company" (PFIC) assets.

Over the years, Mr. Clemons followed careful steps to access his UBS funds. He periodically traveled to Switzerland and met with a UBS representative. On these visits, he withdrew funds and requested and received checks from UBS. He never wired money directly from UBS to his own domestic accounts.

II.    *Mr. Clemons's Employment and Tax Reporting*

Beginning in 2003, Mr. Clemons experienced a series of life and career changes. In January 2003, Mr. Clemons divorced his wife. He did not disclose his UBS account to his wife or to the Florida court that oversaw the divorce. Mr. Clemons also began working for various companies, some of which were outside the United States. He often caused his compensation to be directed into his UBS account. At times he provided services to foreign employers while residing in Florida, and at other times he resided abroad, but he always maintained a residence in Florida.

A.    *2003*

Mr. Clemons experienced a shift in his employment in 2003, but little changed. He had been working as an independent contractor for HP USA. When that contract ended, he continued working for HP, but

[*4] the contracting party changed to Hewlett-Packard Australia (HP Australia). Although the contracting party changed, Mr. Clemons still worked on the same project he had worked on at HP USA and continued to live in Florida.

There is no documentary evidence that Mr. Clemons paid Australian taxes on the income he earned from HP Australia. In 2003, HP Australia paid him $151,481, which was deposited directly into his UBS account. HP Australia paid him through an Australian payroll company, Entity Solutions Services Pty Ltd (Entity Solutions). He provided no documents showing that Entity Solutions withheld Australian taxes from his paycheck or paid tax to Australia on his behalf. He did not file Australian tax returns.

Mr. Clemons timely filed his 2003 tax return. He personally prepared the return using Turbo Tax return preparation software. He did not report the income from HP Australia that was deposited into his UBS account. Neither did he report the investment income he earned on that account or make any elections with respect to that income. *See* I.R.C. §§ 1295 and 1296.[2] Mr. Clemons reported adjusted gross income (AGI) of $52,000, which consisted entirely of wages he paid himself from SWI reported on Form W–2, Wage and Tax Statement. He reported taxable income of $38,900.

In addition to failing to report income paid into or earned by his UBS account, Mr. Clemons also failed to disclose the account's existence. Because he did not include a Schedule B, Interest and Ordinary Dividends, with his return, he did not disclose the UBS account on that form. Neither did he file a Treasury Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts (FBAR), reporting his financial interest in his UBS account.

B.    *2004*

Mr. Clemons continued working for HP Australia in 2004 while residing in Florida, earning $252,858. Like his 2003 earnings, those funds were deposited directly into his UBS account. In June, Mr. Clemons's teenage daughter was murdered. He was grief stricken, and

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*5] her death ushered in a difficult period in his personal life. Throughout, he continued to manage his professional and financial affairs. In October, he visited UBS in Switzerland to review his account. While there, he requested and received a check for $75,000, and his account representative recorded in his notes that Mr. Clemons expressed satisfaction with his investment portfolio's performance.

Mr. Clemons timely filed his 2004 return, which he personally prepared using Turbo Tax. He reported AGI of $54,000, consisting entirely of wages from SWI. He did not report the income paid directly into or earned by his UBS account. He did not include a Schedule B with his return and accordingly did not report his UBS account on that form. Neither did he report that account's existence on an FBAR.

C. *2005*

In 2005, Mr. Clemons continued working for HP Australia while residing in Florida, earning $253,383, which was deposited directly into his UBS account. Again, he visited UBS in Switzerland to review his account. He requested and received a check for $65,000 and, according to his account representative, expressed satisfaction with his investment portfolio's performance and UBS's service.

Mr. Clemons untimely filed his 2005 return, which he personally prepared using Turbo Tax. He reported AGI of $57,160, which consisted primarily of wages from SWI. He did not report the income paid directly into or earned by his UBS account. He did not include a Schedule B with his return and accordingly did not report his UBS account on that form. Neither did he report that account's existence on an FBAR at that time.

D. *2006*

In the first half of 2006, Mr. Clemons continued working for HP Australia while residing in Florida, earning $117,670. He also continued his pattern of traveling to Switzerland to visit UBS. In February he traveled to UBS, where he requested and received a check for $167,000 and, according to his account representative, expressed satisfaction with his investment portfolio's performance and asset allocation. He also signed a "Confirmation of Receipt UBS Retained Mail." His signature on that form confirmed that UBS presented his account correspondence to him in a sealed envelope and that he authorized UBS to destroy any mail he left behind.

[*6]    After Mr. Clemons's HP Australia contract ended, he decided to try his hand as a cattle rancher. Operating as Alafia Cattle Co. (Alafia), he purchased farm and veterinary supplies, a Cub Cadet mower, and a Honda four-wheeler to get around his Florida property.

Later that year, he visited UBS in Switzerland again to review his account. He withdrew $350,000 and, according to his account representative, expressed satisfaction with his investment portfolio's performance. He signed more documents, including a "Confirmation of Receipt UBS Retained Mail" and a "Master agreement for derivatives trading and forward transactions."

Mr. Clemons timely filed his 2006 return, which he personally prepared using Turbo Tax. He reported AGI of $79,666, which consisted of $16,000 of wages from SWI, $1,510 of taxable interest from a domestic bank account, $90,878 of qualified dividends, and a loss of $28,722 from Schedule C, Profit or Loss From Business. That loss stemmed from Alafia, for which Mr. Clemons reported no income, only expenses.

Mr. Clemons did not report the income deposited into or earned by his UBS account, and he did not report the account's existence. However, for the first time during the years at issue, he included a Schedule B with his return. On that form, he reported his domestic interest income. Part III, line 7a, of Schedule B asks whether the taxpayer had "an interest in . . . a financial account in a foreign country, such as a bank account, securities account, or other financial account" at any time during 2006 and references the instructions for filing an FBAR. In response to that question, Mr. Clemons answered "No." He did not disclose his UBS account on Schedule B, and he did not timely file an FBAR for 2006. Neither did he make any election under section 1295 or 1296.

E.    *2007*

In 2007, Mr. Clemons continued cattle ranching with little success. Using funds he had withdrawn from UBS in 2006, he purchased land adjacent to his Florida home and kept a few horses and cattle there. He looked after the animals and quickly discovered that cattle ranching is tough work. According to Mr. Clemons, the business lasted for "about a year" from its inception.

After the failed cattle business, Mr. Clemons got back into computer programming and continued his pattern of traveling to Switzerland. He had a short-term job, earning wages of $47,095 from

[*7] Volt Technical Resources, LLC (Volt), in California. He deposited his compensation from Volt directly into his domestic account. He also conducted an IT consulting business through a new company, Applied Software Concepts, Inc. (ASCI), earning $8,000. In December, he visited UBS to review his account. He withdrew 7,500 euro and, according to his account representative, expressed satisfaction with his investment portfolio's performance.

Mr. Clemons untimely filed his 2007 return, which he personally prepared using Turbo Tax. He reported AGI of $2,249. He included $47,095 of wages from Volt and income from two Schedule C businesses—Alafia and his work as an IT consultant. For Alafia, he reported a loss of $26,125. For his work as an IT consultant, he reported a net profit of $8,000, corresponding to a Form 1099–MISC, Miscellaneous Income, issued by ASCI for that amount. He reported $2,001 of taxable interest from a domestic bank account. Finally, Mr. Clemons reported a net operating loss (NOL) carryover from 2006 of $28,722; that amount represented the NOL from Alafia that he fully used in 2006.

Again, Mr. Clemons did not report the income earned by his UBS account, or that account's existence, despite having included a Schedule B with his return. On the Schedule B, he reported only domestic interest income and indicated he had no foreign financial accounts during 2007. He did not timely file an FBAR. And he did not include an election under section 1295 or 1296.

F.    *2008*

In January 2008, Mr. Clemons started working for Axantis, a software company in Pirmasens, Germany, earning $139,794. He worked as a subcontractor for Axantis, which contracted directly with other companies, including the U.S. Army. On the basis of timesheets Mr. Clemons submitted, Axantis billed the appropriate company for his services and then paid him. Axantis also reimbursed certain expenses if he reported those expenses with his timesheets. Axantis reimbursed Mr. Clemons for $12,642 of the total expenses of $19,400 he submitted. He incurred unreimbursed expenses of $6,758.

Axantis directly deposited Mr. Clemons's compensation at a new bank account he opened in Germany at Volks Reich-Bank Pirmasens (VR-Bank). It was a savings account for which he received account statements, and he typically accessed it by making ATM withdrawals.

[*8] Using the cash he withdrew, he would buy groceries, send money to the United States, and pay rent for an apartment in Pirmasens (1,500 euro/month). In a series of wire transfers that began in January and ended in August, he also wired $86,727 to an acquaintance in Florida. Meanwhile, he charged thousands of dollars to ASCI's American Express, including amounts paid to hotels and restaurants in Amsterdam, Paris, and Frankfurt.[3]

In October 2008, Mr. Clemons stopped working for Axantis and visited UBS in Switzerland. Around that time, UBS had begun advising U.S. persons of new reporting requirements. At UBS, he requested a $20,000 check and signed a "Confirmation of Receipt UBS Retained Mail." While he was there, an account representative explained the "new business model" UBS was using for accounts held by U.S. persons. After that discussion, Mr. Clemons directed UBS to liquidate his investment portfolio, hold the funds, and await further instructions.

Mr. Clemons left UBS and opened a second Swiss bank account the same day. He walked to nearby Dresdner Bank (Switzerland), Ltd. (Dresdner), and opened a numbered investment account. Like UBS, Dresdner agreed to hold account correspondence. Mr. Clemons directed UBS to transfer his funds to Dresdner. UBS completed his request through two transfers (one in November and another in December) totaling $550,063, which Mr. Clemons mostly invested in mutual funds.

After his trip to Switzerland, Mr. Clemons returned to the United States briefly at the end of 2008. The UBS representative mailed the $20,000 check Mr. Clemons had requested to his home in Florida on December 4, 2008.

Mr. Clemons untimely filed his 2008 return, which he personally prepared using Turbo Tax. He included income from two Schedule C businesses, Alafia and his work in Germany as a "project engineer." For Alafia, he reported a loss of $9,997, and for his work as a project engineer, he reported net profit of $24,069. He also reported $37 of taxable interest from domestic accounts. Lastly, as he had in 2007, Mr. Clemons claimed a $28,722 NOL carryover that originated with Alafia in 2006 and that he had used twice before, first as a loss in 2006 and again as an NOL carryover in 2007.

---

[3] He testified that he incurred those expenses in connection with his work for Axantis in Germany.

**[*9]**    Mr. Clemons's reporting of his income as a project engineer in Germany is notable. On Schedule C, he reported gross receipts of $139,794. He reduced that income by expenses totaling $115,725, consisting of $12,000 for rent or lease of "other business property" and $103,725 for travel, meals, and entertainment. These items netted to the $24,069 net profit he reported on Schedule C. On a separate Form 2555, Foreign Earned Income, he reported gross receipts of $139,794 as foreign earned income and claimed an exclusion of $74,635. Mr. Clemons's reporting had the effect of both reducing his gross receipts of $139,974 by $115,725 of expenses and excluding $74,635 of those gross receipts from income, therefore excluding from income most of the gross receipts for which he reported Schedule C expenses.

Mr. Clemons's reporting of his interest income for 2008 is also notable. He included a Schedule B with his return on which he reported domestic interest. But unlike prior years' returns, his 2008 return reported that he held foreign financial accounts. However, on the line used to identify the foreign country or countries where he held any accounts, Mr. Clemons disclosed Germany but not Switzerland. Although his printed Turbo Tax instructions showed that he prepared an FBAR and those instructions directed him to "file it on or before June 30, 2009," he did not timely file an FBAR. He did not include an election under section 1295 or 1296.

G.    *2009*

Mr. Clemons's travel and work activity in 2009 is unclear. At trial, he gave conflicting testimony, which was also inconsistent with the documentary record. However, he lived in Amsterdam from January through June 2009. In Amsterdam he held a savings account at ABN AMRO, which he used to pay personal expenses and for which he did not receive account statements. In August 2009, he visited Germany for 40 days, and while there, he earned $9,600 working on a short-term project. In September 2009 he returned to Florida permanently.

Mr. Clemons continued to hold an account at Dresdner throughout 2009. He frequently shifted his assets within the account by selling interests in the money market funds, converting U.S. dollars to euro, and purchasing financial products. He kept the account open until December 30, 2010, when Dresdner issued him a check for the balance of $543,766.

[*10] Mr. Clemons untimely filed his 2009 return, which he personally prepared using Turbo Tax. He reported negative AGI. He included $9,600 of wages and attached a Form W–2 issued by Application Development Resources in Alpharetta, Georgia, to his return. He also included income from two Schedule C businesses, Alafia and "softwarewizardry.nl." For Alafia, he reported a net loss of $11,339. For softwarewizardy.nl, he reported a net loss of $63,775, which consisted entirely of expenses—including, among others, $44,975 for rent or lease and $15,813 for travel, meals, and entertainment. He also reported taxable interest from a domestic account. Lastly, for the fourth time, Mr. Clemons claimed a $28,722 loss that originated with Alafia in 2006 and that he had previously used in 2006, 2007, and 2008.

Like Mr. Clemons's testimony regarding his 2009 activities, his income reporting was inconsistent. Although he reported $9,600 of wages from a company in the U.S. state of Georgia on his return, he reported the same amount as foreign income from self-employment in Germany (as a "program engineer") on Form 2555. He claimed an exclusion for $9,600, thus excluding an amount equal to his wages from income.

Mr. Clemons's reporting of his interest income is also notable. He included a Schedule B with his return on which he reported domestic interest. He reported that he held a foreign financial account in the Netherlands but not Switzerland. He did not include any income from the Dresdner account anywhere on his return. Although his printed Turbo Tax instructions showed that the software had prepared an FBAR and instructed him to "file it on or before June 30, 2010," he did not timely file an FBAR. He did not include an election under section 1295 or 1296.

III. *IRS Examination*

A. *Discovery of the UBS Account*

In 2011, Mr. Clemons's returns became the subject of an IRS examination. Before getting into the details of that examination, context is helpful to understand how this came about.

In 1996, the United States and Switzerland entered into a tax treaty whereby they agreed to exchange taxpayer information to avoid double taxation and prevent fraud. Pursuant to that treaty, UBS entered into an agreement with the IRS in January 2001. That

**[*11]** agreement established reporting procedures to help the IRS identify UBS's unnamed U.S. clients.

Records and testimony provided in connection with a congressional investigation show that in 2001 or 2002, UBS took steps to limit the agreement's effect. UBS began dividing U.S. clients into two groups: those who were willing to report their accounts to the IRS and those unwilling to do so. UBS representatives helped the unwilling group maintain "anonymity" and "fraudulently evade large amounts of tax." UBS's practices garnered scrutiny from the U.S. Department of Justice, which launched an investigation that was publicized in a July 2008 congressional hearing held on the matter. In the wake of these events, UBS stopped providing "offshore banking or securities services to U.S. residents." It was also in 2008 that Mr. Clemons closed his UBS account and moved his assets to Dresdner.

The IRS also tried to protect its interests as events unfolded. In summer 2008, the IRS issued UBS a summons that requested information about UBS's U.S. accountholders in 2002 through 2007. UBS responded with certified records, including account opening documents, account statements, and correspondence. Through those records, the IRS discovered Mr. Clemons's UBS account. The records were assigned to revenue agents for examination and form a significant part of the record before us. The examination began in May 2011.

B. *Filing of Delinquent FBARs*

In July 2011, after the examination began, Mr. Clemons filed delinquent FBARs for 2005 through 2009. Those FBARs were false, incomplete, and misleading. The 2005 through 2007 FBARs called the UBS account a Swiss bank account instead of a securities account. The 2008 FBAR called the Dresdner account a German bank account—without an account number—instead of a Swiss securities account. However, it properly identified the VR-Bank account. The 2009 FBAR again misidentified the Dresdner account but properly identified the ABN AMRO account, including its account number.

C. *Examination Interview*

In August 2011, revenue agents conducted an in-person interview with Mr. Clemons and his attorney. At that interview, he provided some receipts for his expenditures in 2007 through 2009 and account statements from VR Bank. He informed revenue agents that he otherwise lacked account statements but instead maintained an Excel

**[\*12]** spreadsheet, which he referred to as a ledger, to keep track of his foreign account balances.

During the interview, Mr. Clemons misled revenue agents about the UBS account. He falsely informed them that he had opened the account for privacy reasons, more than 20 years earlier; the account-opening records were in German; the account was an unnumbered, non-interest-bearing, savings account; he made only one withdrawal; and the last deposit was in 2005. He failed to mention his HP Australia compensation deposited in 2003 through 2006. When asked why he had failed to report the account on Schedule B or an FBAR, he claimed ignorance of having earned income to report.

D.     *Information Document Requests and Summons*

After the interview, a revenue agent issued information document requests (IDRs) to Mr. Clemons and his attorney. The IDRs requested bank account information (including bank statements and identification of deposits, transfers, and credits) and income information (such as Forms 1099, copies of client contracts, or other statements showing how much income he received).

Mr. Clemons gave an incomplete response. He failed to provide UBS account statements, information regarding his income, or his personal account ledger. A revenue agent eventually issued a third-party summons to Mr. Clemons's attorney, who provided the records in her possession.

E.     *Bank Deposits Analysis and Penalty Approval*

In July 2012, a revenue agent analyzed deposits into Mr. Clemons's bank accounts. The analysis included foreign and domestic accounts. The revenue agent discovered unreported income, including HP Australia compensation, gains from trading PFIC assets, and unidentified deposits in domestic accounts. The revenue agent categorized domestic deposits as gross receipts from Schedule C unless substantiated with a nontaxable source. The revenue agent calculated PFIC gain and tax according to section 1291.

The revenue agent decided to assert penalties under sections 6662 and 6663. He prepared Forms 4549, Income Tax Examination Changes, commonly known as a revenue agent report (RAR), asserting those penalties. The revenue agent's immediate supervisor communicated those penalties to Mr. Clemons on November 12, 2014,

**[\*13]** when he mailed him a Letter 5153 and enclosed the RAR with that letter. The supervisor signed the Letter 5153.

IV.    *Notice of Deficiency*

The Commissioner mailed Mr. Clemons a notice of deficiency on August 25, 2016. The Commissioner determined tax deficiencies, additions to tax, and penalties as follows:

| Year | Deficiency | Addition to Tax/Penalties | | |
|------|-----------|------------------|------------------|------------------|
| | | *I.R.C. § 6651(a)(1)* | *I.R.C. § 6662* | *I.R.C. § 6663* |
| 2003 | $53,081 | — | — | $39,811 |
| 2004 | 112,892 | — | — | 84,669 |
| 2005 | 91,650 | $18,330 | — | 68,738 |
| 2006 | 69,150 | — | $515 | 48,794 |
| 2007 | 51,838 | 9,942 | — | 35,035 |
| 2008 | 68,428 | 17,107 | 325 | 39,058 |
| 2009 | 7,851 | 1,963 | — | 5,888 |

The deficiency determinations are largely based on unreported income from the bank deposits analysis. As relevant to this Opinion, the Commissioner determined taxable income as follows:

| Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|------|------|------|------|------|------|------|------|
| Gross Receipts | $151,481 | $252,858 | $253,383 | $117,670 | $5,076 | $66,328 | $43,544 |
| Ordinary Dividends | 555 | 1,611 | 3,082 | 3,802 | 2,712 | 2,767 | — |
| I.R.C. § 1291 PFIC Gain | 6,172 | 30,636 | 7,343 | 22,616 | 18,176 | 13,838 | — |
| Taxable Interest | — | — | — | — | — | — | 2,226 |

[*14] The Commissioner also disallowed various deductions that Mr. Clemons claimed on Schedule C for Alafia (C1) and for his IT activities (C2). As relevant to this Opinion, the Commissioner disallowed the following amounts:

| Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Sched. C1 | — | — | — | $17,158 | — | $11,497 | $13,074 |
| Sched. C2 | — | — | — | — | — | 115,725 | 60,788 |
| NOL Carryover | — | — | — | -— | $28,722 | 28,722 | 28,722 |

The Commissioner reduced Mr. Clemons's 2008 foreign earned income exclusion but allowed a foreign housing deduction and determined additional self-employment tax for each year except 2007 and 2009.

The Commissioner determined section 6651(a)(1) additions to tax for untimely filing returns for 2005 and 2007 through 2009.

The Commissioner determined that section 6662 accuracy-related penalties applied to portions of the underpayments for 2006 and 2008. Those portions were attributable to expense deductions Mr. Clemons claimed on Schedules C for Alafia that the Commissioner disallowed and determined to be negligent. Although the Commissioner disallowed all expense deductions for Alafia for 2008, he determined the penalty with respect to the disallowance of only some of those deductions.

The Commissioner determined section 6663 civil fraud penalties for all the years at issue. For 2006 through 2009, the Commissioner determined section 6662 penalties as alternatives to the fraud penalties.

While residing in Florida, Mr. Clemons timely filed a petition for redetermination of the deficiencies. He disputes the entire amount of the deficiencies, penalties, and additions to tax for each year.

V.     *Mr. Clemons's Credibility*

We tried this case in February 2021. Mr. Clemons's trial testimony was self-contradictory, inconsistent with the documentary record, and not credible. For example, he offered shifting explanations

**[*15]** for opening a UBS account. During the examination, he said he had opened the account for privacy reasons. At trial, he testified that he had opened the account to hide money from his then wife. He also testified that he had long considered moving to Europe and opened the Swiss account to facilitate eventually moving there. Yet when he moved to Europe, he opened accounts in the local jurisdictions where he resided.

He claimed ignorance of his reporting requirements, but his claimed ignorance was inconsistent with his actions. He testified that he was unaware of Schedule B and FBAR requirements, but he disclosed his Netherlands and German bank accounts on his returns and reported income from those accounts. And the Turbo Tax records show that the software prepared FBAR forms and instructed Mr. Clemons how and when to file them. Through his testimony, Mr. Clemons implied that UBS invested his money without his knowledge or consent, but he signed various investment-related forms, including an investment management authorization. Those forms were in English (not German, as he told revenue agents and the Court).

## OPINION

The principal issues in this case are (1) the determination of Mr. Clemons's income tax liabilities for 2003 through 2009 and (2) whether those liabilities are subject to section 6663 civil fraud penalties. Redetermining Mr. Clemons's income tax liabilities requires us to consider various issues, including: whether he may retroactively elect to tax his PFIC income under section 1296; whether the Commissioner's determination of unreported gross receipts included nontaxable sources; whether he may deduct previously unreported expenses from his HP Australia income; whether he may deduct various disallowed Schedule C expenses; whether he may offset investment income with expenses and capital losses; whether he may deduct his foreign housing expenses for 2008; and whether he is entitled to a foreign tax credit for 2003 through 2006.

The section 6663 fraud issue is more straightforward, but it bears on a related issue: the period of limitations for assessment under section 6501. Mr. Clemons argues that the section 6501(a) three-year period of limitations bars assessment. The Commissioner argues that the deficiencies may be assessed at any time under section 6501(c)(1) because they were due to fraud. Mr. Clemons disagrees.

**[\*16]** I. *Deficiencies*

 A. *Income; Burden of Proof and Production*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). However, a special rule applies to determinations of unreported income. The Commissioner's determinations of unreported income are presumptively correct if supported by a minimal evidentiary foundation linking the taxpayer to an income-producing activity. *Blohm v. Commissioner*, 994 F.2d 1542, 1549 (11th Cir. 1993), *aff'g* T.C. Memo. 1991-636. After the Commissioner produces evidence linking the taxpayer to an income-producing activity, the burden shifts to the taxpayer to prove the determinations are arbitrary or erroneous. *Id.*

Here, the Commissioner's determinations are presumptively correct. Because Mr. Clemons lacked records substantiating his income, the Commissioner reasonably reconstructed unreported income using a bank deposits analysis. *See DiLeo v. Commissioner*, 96 T.C. 858, 867 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992); *see also* I.R.C. § 6001; Treas. Reg. § 1.6001-1(a). After showing that Mr. Clemons received bank deposits, the Commissioner needed only to produce evidence linking him to an income-producing activity to shift the burden. To that end, the record is replete with evidence that Mr. Clemons operated various Schedule C businesses during the years at issue and invested through his Swiss accounts. Thus, the Commissioner's determinations are presumptively correct.

The burden has shifted to Mr. Clemons to prove the Commissioner's determinations are arbitrary or erroneous.[4] To meet his burden, he must show that the deposit is derived from a nontaxable source or otherwise excludable from income. *See DiLeo*, 96 T.C. at 868–69, 871.

 1. *Gross Receipts*

The Commissioner determined additional gross receipts for Mr. Clemons for each year before us on the basis of deposits into his various accounts. Entity Solutions deposited $151,481, $252,858, $253,383, and $117,670 in Mr. Clemons's UBS account as compensation for services in

---

[4] Mr. Clemons does not ague for, and the record does not support, shifting the burden back to the Commissioner. *See* I.R.C. § 7491(a).

[*17] 2003, 2004, 2005, and 2006, respectively, which he does not dispute. Mr. Clemons also received bank deposits in excess of his reported income in 2007 through 2009. The Commissioner characterized the deposits as gross receipts from Mr. Clemons's Schedule C businesses: $5,076, $66,328, and $43,544 for 2007, 2008, and 2009, respectively.

For 2008, Mr. Clemons argues that deposits into his domestic accounts totaling $66,328 were previously taxed. He claims that the deposits came from compensation that had previously been deposited into his VR-Bank account and had already been taxed. He further claims that he deposited that money in Florida while residing abroad by using his acquaintance (to whom he had wired money from VR-Bank in 2008) as an intermediary. There is no evidence of this arrangement other than Mr. Clemons's testimony, which we do not find credible. At trial, he tried to demonstrate that each deposit to his domestic account corresponded to a wire transfer to his acquaintance. However, the wire transfers exceeded the deposits in both number and amount, and the dates of each do not correspond. For example, the last wire transfer of 4,500 euro was in August 2008, whereas the last (and largest) deposit of over $20,000 was in December 2008. In sum, Mr. Clemons failed to provide sufficient evidence showing that the excess deposits were from nontaxable sources.

During 2003 through 2006, Mr. Clemons received income from Entity Solutions as compensation for the services rendered to HP Australia. During 2007 through 2009, Mr. Clemons operated as an IT consultant and received deposits into his bank accounts for his efforts. The income derived from these activities constitutes "self-employment income" under section 1402 and is subject to the self-employment taxes of section 1401.

### 2. *UBS Investment Income*

Through his UBS account, Mr. Clemons received dividend income and income from trading PFIC assets in 2003 through 2008. *See* I.R.C. § 1297. The Commissioner determined PFIC income and tax according to section 1291. Mr. Clemons does not dispute the Commissioner's calculation of ordinary dividends. He argues that he may retroactively elect to have his PFIC income and tax determined according to section 1296.

**[\*18]** By default, PFIC income is taxed according to section 1291, unless a taxpayer elects otherwise. *See* I.R.C. §§ 1291(a)–(c), 1295, 1296. In 1996, Congress enacted section 1296, allowing taxpayers to elect mark-to-market treatment. In 2002, the Secretary promulgated proposed regulations setting forth the rules for making such an election. Prop. Treas. Reg. § 1.1296-1, 67 Fed. Reg. 49,634 (July 31, 2002). Those regulations became final in 2004. T.D. 9123, 2004-1 C.B. 907 (May 3, 2004); *see* Treas. Reg. § 1.1296-1(h)(1). Under either the proposed or the final regulations, for a taxpayer's PFIC income to be taxed according to section 1296, he generally must make an election by the due date for filing his income tax return for the first year to which the election will apply. Treas. Reg. § 1.1296-1(h)(1); Prop. Treas. Reg. § 1.1296-1(h)(1), 67 Fed. Reg. at 49,642. Whether a taxpayer is eligible to make a retroactive election under section 1296 turns on general rules regarding extensions for regulatory elections. Treas. Reg. § 1.1296-1(h)(1)(iii); *see* Treas. Reg. § 301.9100-1. Automatic extensions of six months may be available to taxpayers who take certain corrective action during that period (which Mr. Clemons did not). *See* Treas. Reg. § 301.9100-2(b). If a taxpayer does not meet the requirements for an automatic extension, his request for retroactive relief will be granted if he shows that he "acted reasonably and in good faith" and that "the grant of relief will not prejudice the interests of the Government." Treas. Reg. § 301.9100-3(a). A taxpayer is deemed to not have acted reasonably or in good faith when he "[u]ses hindsight in requesting relief." Treas. Reg. § 301.9100-3(b)(3)(iii). If a change in circumstances after the original due date for an election makes the election more advantageous, "the IRS will not ordinarily grant relief." *Id.*

Mr. Clemons is not entitled to make a retroactive election because his claim is based on hindsight. Mr. Clemons did not make an election under section 1296 when filing his original returns. He first raised the possibility of making a retroactive election only after the Commissioner began his examination, discovered the UBS investments, and determined PFIC income. The election became advantageous to Mr. Clemons only when the Commissioner discovered the unreported PFIC income, and Mr. Clemons seeks to take advantage of hindsight in making an election long after it was due.

### 3. *Interest Income*

For 2009, the Commissioner determined taxable interest income of $2,226. Although Mr. Clemons placed the entire deficiency at issue, he did not offer any argument or evidence to dispute the Commissioner's

**[\*19]** interest income determination. Accordingly, the Commissioner's interest income determination is sustained.

### B.     *Deductions, Credits, etc.; Burden of Proof*

Taxpayers bear the burden of proving their entitlement to deductions and credits. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Taxpayers must maintain records sufficient to establish the amount of each deduction, and failure to produce such records counts heavily against a taxpayer's attempted proof. *Rogers v. Commissioner*, T.C. Memo. 2014-141, at \*17; *see* Treas. Reg. § 1.6001-1(a), (e).

### 1.     *Business Expenses*

Section 162(a) generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The taxpayer bears the burden of proving that business expenses were actually incurred and were "ordinary and necessary." I.R.C. § 162(a); *see* Rule 142(a). If the taxpayer establishes that an expense is deductible but cannot substantiate the precise amount, the Court may estimate the amount. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). However, the taxpayer must provide some basis for an estimate. *See Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985).

### a.     *HP Australia*

Mr. Clemons argues that he is entitled to deduct expenses that he did not report on Schedule C that he incurred while working for HP Australia in 2003 through 2006. At trial, he estimated those expenses as a percentage of his income (15% to 30%) and argued that he is entitled to deduct a similar amount (at least 20% to 30%). However, he provided no record of those expenses or information upon which the Court could reasonably base an estimate. Mr. Clemons failed to meet his burden of proof.

### b.     *Alafia*

Mr. Clemons argues that he may deduct Schedule C expenses for Alafia for 2006 through 2009.

For 2006 and 2007, Mr. Clemons failed to meet his burden. For 2006, the Commissioner disallowed deductions for (1) car and truck

**[*20]** expenses, (2) travel expenses, and (3) repairs. Mr. Clemons did not provide records for those expenses. For 2007, the Commissioner allowed deductions for all expenses Mr. Clemons reported on Schedule C, and Mr. Clemons provided no records of additional expenses.

For 2008 and 2009, Mr. Clemons may not deduct his expenses under section 162. Section 162 allows a deduction only for expenses incurred in carrying on a trade or business. The test for whether a taxpayer is engaged in a trade or business is whether his primary purpose and intention in engaging in the activity is to make a profit. *Zell v. Commissioner*, 763 F.2d 1139, 1142 (10th Cir. 1985), *aff'g* T.C. Memo. 1984-152. During 2008 and 2009, Mr. Clemons's primary purpose in keeping cattle and horses was not to make a profit. By his own account, he started Alafia in 2006, and it lasted only for about a year. In 2008, he resided in Europe for most of the year, and in 2009, he also spent substantial time there. By his own testimony, Alafia was not operating as a business in 2008 and 2009; thus no deduction is allowed for those years.

### c. *Axantis*

Mr. Clemons argues that he may deduct Schedule C expenses for Axantis for 2008. He produced reports he submitted to Axantis, showing unreimbursed expenses of $6,758. The Commissioner concedes that Mr. Clemons is entitled to deduct those unreimbursed expenses, subject to the limitation of section 911(d)(6). Section 911(d)(6) disallows a deduction to the extent expenses are allocable to amounts excluded from income pursuant to section 911(a) (foreign earned income exclusion). If a taxpayer excludes part of his foreign income, he may deduct an amount of expenses proportional to the percentage of foreign income not excluded. Treas. Reg. § 1.911-6. For 2008, Mr. Clemons excluded $74,635 of the $139,794 total foreign income he reported, or 53.4%. He did not exclude 46.6%, so he may deduct 46.6% of $6,758.

### d. *Other Activities*

Mr. Clemons argues that he may deduct Schedule C expenses for softwarewizardry.nl, a business in the Netherlands, for 2009. He reported no income on Schedule C for softwarewizardry.nl. He reported substantial expenses for meals, travel, and rent, which the Commissioner disallowed.

Whether softwarewizardry.nl was an active business is unclear from the record. According to Mr. Clemons, his only work activity during

**[\*21]** 2009 was a short-term project he undertook while residing in Germany for 40 days, for which he earned $9,600 (according to Form 2555). He did not report $9,600 as income from softwarewizardry.nl. Nevertheless, he testified that the expenses he reported were "typical business-related expenses for travel, meals, parking, hotel stays, and any type of expenses related to [his] travel and [his] stay in Germany."

If we were to accept Mr. Clemons's testimony, he would still fail to meet his burden. Mr. Clemons did not provide any evidence of those expenses other than his testimony. And his testimony failed to credibly explain how he incurred over $60,000 of legitimate business expenses in connection with $9,600 of income while residing in Germany for 40 days. Mr. Clemons failed to meet his burden.

### 2. *Investment Expenses*

Mr. Clemons argues that he is entitled to deduct under section 212 the amounts he paid UBS as fees for maintaining his investment account. The Commissioner concedes Mr. Clemons is entitled to deduct such expenses to the extent he demonstrates that he paid the fees and that they exceed 2% of his AGI. *See* I.R.C. § 67; Temp. Treas. Reg. § 1.67-1T. Also, because Mr. Clemons elected the standard deduction for 2003 through 2005, the amount by which they exceed the 2% floor must also exceed the standard deduction for those years.

For 2003 and 2004, Mr. Clemons did not establish the amounts of his investment expenses. He claimed that he incurred amounts "[a]s set forth in the UBS statements" without any further information or reference. He failed to meet his burden for 2003 and 2004. For 2005 through 2009, Mr. Clemons established the following amounts: $9,091, $10,911, $8,570, $8,661, and $1,910, respectively. The extent to which he may deduct those amounts will be determined when the parties complete their Rule 155 computations.

### 3. *Foreign Tax Credit*

Mr. Clemons argues that he is entitled to a foreign tax credit for each of 2003 through 2006. Generally, a U.S. citizen can claim a credit in the amount of any income taxes paid or accrued during the taxable year to any foreign country. I.R.C. § 901(a) and (b). When a taxpayer claims a credit for foreign income taxes withheld at the source, he must establish that the tax was withheld and that it was paid over to the foreign taxing authority. *Norwest Corp. & Subs. v. Commissioner*, T.C.

**[\*22]** Memo. 1995-453, 70 T.C.M. (CCH) 779, 781; *see* I.R.C. § 905; Treas. Reg. § 1.905-2.

Mr. Clemons failed to meet his burden. He testified that Entity Solutions withheld taxes from his HP Australia compensation and paid them over to the Australian government but provided no documentary evidence. Because he failed to provide sufficient evidence showing that tax was withheld by Entity Solutions or paid over to the Australian government, Mr. Clemons did not meet his burden.

### 4. *Foreign Income Exclusion and Housing Deduction*

For 2008, the Commissioner concedes that Mr. Clemons may exclude foreign income of $74,635 pursuant to section 911(a). However, Mr. Clemons argues he may also deduct rent expenses for an apartment he claims to have resided at in Germany. Section 911 permits a qualified individual to exclude a percentage of his foreign earned income and housing cost amount from gross income. I.R.C. § 911(a), (c)(1), (3). When the housing cost amount is not employer provided, it is generally treated as deductible, subject to a limitation. I.R.C. § 911(c); Treas. Reg. § 1.911-4(e).

Axantis did not reimburse Mr. Clemons's housing costs. To the extent he had any housing costs, he failed to provide credible evidence of those costs, and he may not deduct them.

## II. *Penalties and Additions to Tax*

### A. *Burden of Proof and Production*

Section 7491(c) provides that the Commissioner bears the burden of production "with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title." To meet his burden, the Commissioner must produce evidence regarding the appropriateness of imposing the penalty or addition to tax. *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). Where applicable, that includes evidence of compliance with section 6751(b). *See Carter v. Commissioner*, T.C. Memo. 2020-21, at \*26–27. Once the Commissioner carries his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause. *See Higbee*, 116 T.C. at 447.

One notable exception to the general rule applies in cases involving fraud. The Commissioner must prove fraud by "clear and

**[\*23]** convincing evidence." Rule 142(b); *see* I.R.C. § 7454(a); *Castillo v. Commissioner*, 84 T.C. 405, 408 (1985).

The Commissioner determined penalties under section 6662 and section 6663 and additions to tax under section 6651(a). The Commissioner must produce evidence that those penalties are appropriate. Such a showing would shift the burden to Mr. Clemons. However, with respect to section 6663, the Commissioner must prove fraud by clear and convincing evidence.

B.     *Managerial Penalty Approval*

Section 6751(b) requires managerial approval of certain penalties, including penalties under sections 6662 and 6663. Section 6751(b)(1) provides that the initial determination to assert penalties must be approved (in writing) by the immediate supervisor of the person who made that determination. An "initial determination" occurs the earlier of when the Commissioner issues a notice of deficiency or formally communicates a decision to determine penalties. *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 14–15 (2020); *Clay v. Commissioner*, 152 T.C. 223, 248–49 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021).[5] A Letter 5153 accompanied by an RAR can be an initial determination. *Oropeza v. Commissioner*, 155 T.C. 132, 140–41 (2020); *Patel v. Commissioner*, T.C. Memo. 2020-133, at \*18–19.

The Commissioner has met his burden with respect to the section 6751(b) penalty approval. The initial determination was the Letter 5153 accompanied by the RAR, because it was the first formal communication of the penalties and the Commissioner mailed it before the notice of deficiency. The Commissioner produced evidence that the supervisor of the revenue agent who prepared the RAR signed the Letter 5153 before mailing it to Mr. Clemons. Thus the penalty was approved before assessment, which has yet to occur in this case. *See Kroner v.*

---

[5] In *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020), the Court of Appeals for the Ninth Circuit recently held that written supervisory approval can occur after the initial determination to impose a penalty has been formally communicated to the taxpayer, so long as it occurs before assessment. *Id.* at 1067–68, 1071–72, 1074. In this case, the initial determination to impose a penalty was approved before it was communicated to Mr. Clemons, and thus the Commissioner satisfied section 6751(b) both as interpreted by this Court and under the looser standard established by the Ninth Circuit.

**[\*24]** *Commissioner*, No. 20-13902 (11th Cir. Sept. 13, 2022), *rev'g in part* T.C. Memo. 2020-73.

C.     *Additions to Tax for Untimely Filing*

Mr. Clemons filed his 2005 and 2007 through 2009 returns late, but he argues that was due to reasonable cause and not willful neglect. *See* § 6651(a)(1); *Mileham v. Commissioner*, T.C. Memo. 2017-168, at \*41–42.

Section 6651(a)(1) imposes an addition to tax for the failure to file a return on or before the due date (including extensions) unless the taxpayer can establish that such failure was "due to reasonable cause and not due to willful neglect." To demonstrate reasonable cause, a taxpayer must show that he exercised ordinary business care and prudence but was nevertheless unable to file on time. *United States v. Boyle*, 469 U.S. 241, 246 (1985); Treas. Reg. § 301.6651-1(c)(1).

Mr. Clemons's failures do not fit within the exception for reasonable cause. He argues he had reasonable cause on the basis of his daughter's death in June 2004. In certain circumstances, the death of a taxpayer's immediate family member may constitute reasonable cause. *Boyle*, 469 U.S. at 243 n.1. However, a taxpayer's selective inability to meet his tax obligations when he can otherwise carry on normal activities does not excuse late filing. *Wilkinson v. Commissioner*, T.C. Memo. 1997-410, 74 T.C.M. (CCH) 566, 571. Mr. Clemons's daughter died in June 2004. Notwithstanding this tragic loss, he timely filed the first return that was due after she died. He also continued working and traveling and carried on with his normal business activities. Because Mr. Clemons could tend to his financial affairs and selectively chose not to meet his tax filing obligations, his failures to timely file do not fit within the exception for reasonable cause.

D.     *Accuracy-Related Penalty*

Section 6662(a) and (b)(1) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax that is due to negligence or disregard of rules. "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, and "disregard" includes any careless, reckless, or intentional disregard. I.R.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(1) and (2). Also, a taxpayer is negligent if he fails to maintain sufficient records to substantiate the items in question. Treas. Reg. § 1.6662-3(b)(1); s*ee Mileham*, T.C. Memo. 2017-168, at \*45.

**[\*25]** The Commissioner determined a section 6662 penalty for negligence for the portions of the 2006 and 2008 underpayments that were attributable to disallowed deductions.[6] The Commissioner met his burden of production by showing that Mr. Clemons failed to maintain sufficient records to substantiate the expenses underlying those deductions.

Mr. Clemons argues that accuracy-related penalties should not apply because he acted reasonably and in good faith under section 6664. Section 6664(c)(1) provides that section 6662 penalties do not apply to any portion of an underpayment as to which the taxpayer acted with reasonable cause and in good faith. That determination depends on all the facts and circumstances. *Higbee*, 116 T.C. at 448; *see* Treas. Reg. § 1.6664-4(b)(1). "'Reasonable cause' requires the taxpayer to demonstrate that he exercised ordinary business care and prudence as to the disputed item." *Barnes v. Commissioner*, T.C. Memo. 2016-79, at \*11. "Good faith" is not expressly defined; however, an honest misunderstanding of fact or law that is reasonable considering the taxpayer's experience, knowledge, and education may indicate reasonable cause and good faith. *See Higbee*, 116 T.C. at 449; *Barnes*, T.C. Memo. 2016-79, at \*11–12.

Mr. Clemons does not fit within the exception. He was an educated and experienced taxpayer. He did not exercise ordinary business care or prudence in reporting expenses for which he lacked adequate substantiation.

E.    *Civil Fraud Penalty*

Section 6663 imposes a penalty of 75% of an underpayment of tax if any part of the underpayment is due to fraud. Once the Commissioner establishes that part of an underpayment is due to fraud, the entire underpayment is treated as "attributable to fraud," except to the extent the taxpayer establishes that some part is not. I.R.C. § 6663(b). The existence of fraud is a factual question to be resolved by considering the entire record. *See DiLeo*, 96 T.C. at 874.

The Commissioner determined a fraud penalty for each year at issue. For each year, the Commissioner must prove two elements of

---

[6] Section 6662(b) (flush language) provides that the 20% penalty shall not apply to any portion of an underpayment to which the section 6663 penalty applies. The Commissioner did not apply section 6663 to the portion of the underpayment to which he applied section 6662.

**[*26]** fraud by clear and convincing evidence: (1) an underpayment of tax and (2) fraudulent intent. *Castillo*, 84 T.C. at 408–09. A taxpayer's failure to meet his burden of proof as to an issue does not satisfy the clear and convincing evidence standard. *DiLeo*, 96 T.C. at 873. The Commissioner's burden applies separately for each of the years. I.R.C. § 7454(a); Rule 142(b); *Castillo*, 84 T.C. at 408–09.

### 1. *Underpayment*

An underpayment is defined as the amount by which the tax imposed by Title 26 exceeds the amounts shown as the tax by the taxpayer on his return. I.R.C. § 6664(a). The Commissioner established by clear and convincing evidence that Mr. Clemons reported less tax than he owed for each year at issue, resulting in the underpayments above.

### 2. *Fraudulent Intent*

We infer fraudulent intent from circumstantial evidence, which may be given more weight depending on the taxpayer's sophistication. *See Clark v. Commissioner*, T.C. Memo. 2021-114, at *36–37. Mr. Clemons earned a bachelor's degree, owned and operated his own businesses for decades, and handled finances and tax reporting without assistance. His education and work experience show that he understood and could manage his finances. We examine his actions and explanations considering his sophistication.

Various "badges of fraud" may indicate fraudulent intent. *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992); *Clark*, T.C. Memo. 2021-114, at *37. The existence of any one badge is not dispositive, but multiple badges together are strong circumstantial evidence of fraudulent intent. *Niedringhaus*, 99 T.C. at 211. Several badges of fraud are evident in this case, including underreporting income, concealing income and assets, filing false documents, failing to cooperate with tax authorities, implausible and inconsistent explanations of behavior, and failing to maintain adequate records. *See id.*

#### a. *Underreporting Income*

A pattern of substantially underreporting income over several successive years can be strong evidence of fraudulent intent. *See Zhadanov v. Commissioner*, T.C. Memo. 2002-104, 83 T.C.M. (CCH) 1553, 1560. Such a pattern evinces fraudulent intent "even where the

**[\*27]** record is 'devoid of the usual indicia of fraud.'" *Isaacson v. Commissioner*, T.C. Memo. 2020-17, at \*48–49 (quoting *Otsuki v. Commissioner*, 53 T.C. 96, 107–08 (1969)), *aff'd*, 2022 WL 541617 (9th Cir. Feb. 23, 2022).

Mr. Clemons substantially underreported his income for seven consecutive years. Over those years, Mr. Clemons underreported his income by over $1 million. His substantial and consistent underreporting is persuasive evidence of fraudulent intent.

b.   *Concealment*

A taxpayer's concealment of income or assets may indicate fraudulent intent. *See Spies v. United States*, 317 U.S. 492, 499 (1943). Notably, opening a Swiss bank account can indicate concealment. *See Harrington v. Commissioner*, T.C. Memo. 2021-95, at \*35–36. Switzerland's bank practices and legal framework make it difficult for other countries to obtain disclosure of Swiss bank accounts. *See Ryan v. Commissioner*, 58 T.C. 107, 109–10 (1972) ("[T]he laws of that country have long imposed a veil of secrecy over transactions between Swiss banks and their customers.").

Mr. Clemons's choice to open Swiss bank accounts with secretive features provides ample evidence of concealment. He specifically sought out and found a consultant to refer him to a Swiss bank and then traveled to Switzerland to open an account. Both his UBS and Dresdner accounts bore the secretive features for which Swiss accounts are well known. His name was replaced with a number. He entered into a hold-mail agreement so that no mail would be sent to his U.S. address. And he signed a U.S. securities waiver so that the accounts' investments would not require U.S. tax reporting by the banks. When UBS adopted its "new business model" in October 2008, Mr. Clemons liquidated his account and opened a new Swiss account with similar secretive features, rather than transferring funds to any of his other existing accounts. This demonstrates that it was the secretive features he was specifically seeking.

Mr. Clemons's actions in funneling income into his Swiss accounts, and carefully accessing those accounts in manners to avoid detection, make clear that their very purpose was concealment. He hid the UBS account from his wife and did not disclose it to the state court during his divorce proceeding in 2003. He deposited only foreign income into his Swiss accounts. When an Australian payroll company paid him

[*28] for services he provided to an Australian company, he deposited the compensation in a Swiss account and failed to report it. But when a German company paid him for services he provided to the U.S. Army, he deposited the compensation in a German account held in his name and reported it. He never used his Swiss accounts to transfer money directly to or from his accounts in the United States. Instead, he traveled to Switzerland to make withdrawals in person by requesting checks.

Furthermore, Mr. Clemons concealed his Swiss accounts by failing to timely disclose them. *See Harrington*, T.C. Memo. 2021-95, at *36. On his income tax returns, he reported on Schedule B interest income from his German and Netherlands accounts but not his Swiss accounts. He also failed to file the required foreign account disclosures for his Swiss accounts. In doing so, he disregarded the instructions on the forms he filed as well as the instructions printed by Turbo Tax informing him on what to file and when. Mr. Clemons filed delinquent FBARs for 2005 through 2009 only after the Commissioner opened his examination. He never filed FBARs for 2003 and 2004. Mr. Clemons's efforts to conceal his Swiss accounts provide ample evidence of fraudulent intent.

c.    *Filing False Documents*

The U.S. tax system relies on taxpayers to report their tax liabilities, and the information necessary to calculate those liabilities, via annual returns. Filing false documents indicates a taxpayer's intent to evade income tax. *See id.* at *40. That includes filing an FBAR that is incomplete or filing a return that omits income or contains a false response. *See id.* at *39–40.

Mr. Clemons filed false documents. His delinquent FBARs contained false information about his Swiss accounts, and his returns omitted substantial income and contained false responses on Schedules B. Mr. Clemons failed to attach Schedules B to his 2003 through 2005 returns, even though he had an interest in a foreign account. For 2006 and 2007, he attached Schedules B, but he falsely denied having any foreign bank accounts. For 2008 and 2009, he attached Schedules B, but he disclosed only his foreign bank accounts in Germany and the Netherlands, omitting those in Switzerland from the disclosure. Mr. Clemons's false statements provide evidence of fraudulent intent.

**[\*29]**                    d.       *Failing to Cooperate with Tax Authorities*

A taxpayer's failure to cooperate with tax authorities, including his failure to cooperate with revenue agents during an examination, can indicate fraudulent intent. *Grosshandler v. Commissioner*, 75 T.C. 1, 19–20 (1980). "[M]isleading statements during an audit, even from an unsophisticated taxpayer, may indicate fraudulent intent." *Clark*, T.C. Memo. 2021-114, at \*37.

Mr. Clemons failed to cooperate with tax authorities. When interviewed, he lied about the attributes of his Swiss accounts and how he used those accounts. After the Commissioner issued IDRs, Mr. Clemons did not readily provide documents. Notably, the Commissioner obtained Mr. Clemons's personal account ledger—one of few documents he possessed—only after issuing a third-party summons to his representative. Mr. Clemons attempted to misdirect the Commissioner, and his failure to cooperate provides evidence of fraudulent intent.

e.       *Implausible or Inconsistent Explanations*

Implausible or inconsistent explanations for a taxpayer's behavior can indicate fraudulent intent. *Bradford v. Commissioner*, 796 F.2d 303, 307 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. The Court has previously addressed various situations in which taxpayers made statements about their UBS accounts that were inconsistent with documentary evidence in the record. *Harrington*, T.C. Memo. 2021-95, at \*33–34; *see Isaacson*, T.C. Memo. 2020-17, at \*52–53. One taxpayer's statements that UBS invested his account's funds without his authorization was inconsistent with evidence that UBS invested the funds "following detailed conversations with him concerning the investments." *Isaacson*, T.C. Memo. 2020-17, at \*52. And another taxpayer's statements that he lacked control over his account was inconsistent with evidence that "he communicated with UBS bankers— in person, over the phone, and by email—to discuss investment options." *Harrington*, T.C. Memo. 2021-95, at \*33–34.

Mr. Clemons's explanations are equally implausible and inconsistent. He claimed ignorance of investment activity and suggested that UBS controlled his account, but he signed documents specifying limits on the investment activity and directed how his account would be invested. He claimed records were not in English, but the actual records were in English. His claimed ignorance is contradicted by documents in the record, providing strong evidence of fraudulent intent.

**[*30]**          f.      *Inadequate Records*

Taxpayers must maintain records sufficient to determine their tax liability, and a failure to do so can indicate fraudulent intent. I.R.C. § 6001; *Bradford v. Commissioner*, 796 F.2d at 307–08. A taxpayer's choice not to receive regular UBS account statements may be seen as a "tax-avoidance strategy that he implemented with UBS, hoping that the absence of records, coupled with Swiss bank secrecy laws, would" shield the account from discovery. *Harrington*, T.C. Memo. 2021-95, at *31.

Mr. Clemons purposely kept inadequate records to prevent discovery of his Swiss accounts. He waived his right to invest in U.S. securities and directed UBS and Dresdner to hold correspondence to ensure that records would not be sent to the United States. When UBS presented his bank records to him, he authorized UBS to destroy any mail he left behind. He did not merely fail to keep records, but he took affirmative steps to see that records were destroyed. This badge provides evidence of fraudulent intent.

### 3.      *Conclusion as to Fraud Penalty*

For each year at issue, the Commissioner established by clear and convincing evidence that Mr. Clemons underpaid his tax and that those underpayments were due to fraud. His conduct provides a veritable checklist of badges of fraud. The section 6663 fraud penalty applies.

## III.    *Statute of Limitations*

Mr. Clemons questions whether the Commissioner's notice of deficiency was timely. In 2016, the Commissioner issued a single notice of deficiency for 2003 through 2009, more than three years after Mr. Clemons filed his return for any of those years. Generally, the Commissioner must assess tax within three years from the later of when a return is filed or when it is due. I.R.C. § 6501(a). Thus, the assessments would be time-bared unless an exception to this general rule applies.

A notable exception applies here. If a taxpayer files a false or fraudulent return with the intent to evade tax, tax may be assessed at any time. I.R.C. § 6501(c)(1). The Commissioner established fraud by clear and convincing evidence. We determine fraud for this purpose the same way we determine fraud under section 6663. *Neely v. Commissioner*, 116 T.C. 79, 85 (2001); *Harrington*, T.C. Memo. 2021-95, at *21. The Commissioner may assess the tax, penalties, and additions to tax due from Mr. Clemons at any time.

**[\*31]** IV.    *Conclusion*

Mr. Clemons underpaid his tax for each year at issue and his underpayments were due to fraud. Any arguments not discussed are irrelevant, moot, or without merit. To reflect the foregoing and the parties' concessions,

*Decision will be entered under Rule 155.*